2015 COA 16

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**Roger Julius GLOVER, Defendant–Appellant.**

**Court of Appeals No. 13CA0098**

Colorado Court of Appeals, Div. III.

Announced February 26, 2015

El Paso County District Court No. 11CR4262, Honorable Barney Iuppa, Judge, Honorable David A. Gilbert, Judge.

Cynthia H. Coffman, Attorney General, John T. Lee, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Neff Services, Inc., Lauretta A. Martin Neff, Bayfield, Colorado, for Defendant–Appellant.

Opinion by JUDGE DAILEY

¶ 1· Defendant, Roger Julius Glover, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree (after deliberation) murder. We affirm.

## I. Background

¶ 2 Defendant, who went by the name "Brooklyn," was the thirty-six-year-old "leader" of a "street family" of homeless and runaway teens and young adults. The dead body of one of those young adults was discovered by the police in a gully next to an apartment complex; the victim had suffered numerous "chop" and stab wounds to his head and neck, and one of his fingers was missing.

¶ 3 On the day the victim's body was found, nineteen-year-old Jordan Rowland was arrested on a wholly unrelated matter. In his pocket, however, police found the victim's missing finger.

¶ 4 The prosecution's theory was that Rowland killed the victim at defendant's behest. According to several teens in the street family, defendant had become angry with the victim because the victim was a snitch, owed him money, and would not stop commenting on defendant's Facebook posts. Three teens testified that defendant had placed a "green light" on the victim's head, meaning that defendant wanted the victim killed. A.L. related that he was initially supposed to carry out the "green light" but that he did not want to do it. K.M. related that she had been present when defendant ordered her boyfriend, Rowland, to kill the victim and to bring him evidence that the "job was done."

According to her, defendant threatened to kill her and Rowland if he did not comply; Rowland went to find the victim on the evening of the murder and told her he was going to "work everything out"; she saw Rowland the next morning without the victim; and Rowland told her that he had "taken care of" the victim and "had evidence that the job was done."

¶ 5 In addition to this evidence, the prosecution presented conversations recorded on defendant's Facebook account. In one of the posts from defendant's account, he threatened to "beat the shit outta" the victim and told him "its over for u." In another conversation between defendant and another teen, R.D., R.D. asked "[I]s there still a green light on [the victim's] head[?]," to which defendant responded, "hell yeah I need ur number asap." [1]

¶ 6 Defendant did not testify. He did, however, call two witnesses on his behalf: the lead detective, whom defense counsel questioned about the thoroughness of the investigation; and another police officer, who related that R.D. was a gang member. In closing argument, defense counsel asserted that the teens' testimony was unreliable, pointing out that their stories had changed over time and were inconsistent with each other. Counsel also noted that defendant had not communicated with Rowland following the murder and that A.L. was admittedly high on drugs when he was interviewed by police. Additionally, counsel asserted that if Rowland had killed the victim, it was on his own accord and not at defendant's direction. To support this theory, counsel argued that "everyone had a problem with [the victim]," pointing to evidence that the victim had been in several physical fights in the months before his death, including one with Rowland a few days before the murder.

¶ 7 The jury found defendant guilty of first degree (after deliberation) murder; solicitation to commit first degree (after deliberation) murder; and two crime of violence counts. The trial court merged the solicitation convictions into the murder conviction, disregarded, as surplusage, the crime of violence verdicts and sentenced defendant to a term of life imprisonment without the possibility of parole in the custody of the Department of Corrections.

## II. Facebook Records

¶ 8 Defendant initially contends that the trial court erroneously admitted printouts of communications relating to the murder from his Facebook account. We are not persuaded.

¶ 9 "The admissibility of a computer printout is governed by the rules of relevancy, authentication, and hearsay." *People v. Huehn*, 53 P.3d 733, 736 (Colo. App. 2002). Defendant raises two of these admissibility issues—the Facebook printouts were not properly authenticated and constituted inadmissible hearsay.

¶ 10 We review all evidentiary rulings, including those regarding authentication, for an abuse of discretion. *People v. Bernard*, 2013 COA 79, ¶ 8, 305 P.3d 433. A court abuses its discretion if it misconstrues or misapplies the law or otherwise reaches a manifestly arbitrary, unreasonable, or unfair result. *See People v. Garcia*, 169 P.3d 223, 226 (Colo. App. 2007).

### A. Authentication

¶ 11 CRE 901 through 903 govern the authentication and identification of objects whose admission into evidence is sought by a party.

¶ 12 Authentication is a condition precedent to admissibility of physical evidence that is satisfied by evidence sufficient to support a finding that the evidence in question is what its proponent claims. CRE 901(a); *see People v. Crespi*, 155 P.3d 570, 574 (Colo. App. 2006) (trial court should admit physical evidence if a reasonable jury could decide that it is what the proponent claims it to be).

---

1. The teens and young adults accessed Facebook at a local library or via cellular phones with Internet access.

¶ 13 The burden to authenticate " 'is not high—only a prima facie showing is required,' and a 'district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.' " *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014) (applying rule identical to CRE 901) (quoting *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009)).

¶ 14 A proponent of evidence may establish the authenticity of evidence in numerous ways. CRE 901(b)(1). In some circumstances, proffered evidence can be self-authenticating. *See* CRE 902.

¶ 15 Under CRE 902(11), extrinsic evidence of authenticity is not required with respect to a business record, as defined by CRE 803(6),

if [the record is] accompanied by an affidavit of its custodian or other qualified person ... certifying that the record

(a) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

(b) was kept in the course of the regularly conducted activity; and

(c) was made by the regularly conducted activity as a regular practice.[2]

¶ 16 In the present case, the prosecutor produced an affidavit from a Facebook records custodian stating that

- "[T]he records are basic subscriber information, IP logs, messages, photos, and expanded content for" the profile pages linked to defendant; and

- "The records provided were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook. The records were made at or near the time the information was transmitted by the Facebook user."

¶ 17 In ruling that the Facebook printouts were self-authenticating business records under CRE 902(11), the court analogized the printouts to phone records, finding that

there is a record made on the computer that John Jones has sent Mary Smith a message on a particular day. And it does appear to the Court, just like in phone records, Facebook makes these records. That is[,] this text is reported on a computer program as part of the regularly conducted activity, and regular practice of Facebook. In fact, that is their business. Their business is to allow users to transmit their thoughts and have those thoughts saved, generally back and forth, as part of their business.

¶ 18 The other requirements of CRE 902(11) and 803(6)—i.e., that the record be made at or near the time of the matters recorded in it from information transmitted by a person with knowledge of those matters, and as a regular business practice—presented "more difficult" questions for the court. Ultimately, however, it concluded that

one cannot exclude a Facebook entry, even though the entry itself comes in and is made by an individual completely separate from Facebook, the business. An individual comes in and is recording their messages[,] typing their messages to go to someone else. Facebook is keeping a recorded, is keeping that recorded message as part of their Facebook site....

¶ 19 In *Hassan*, 742 F.3d at 132-35, the federal circuit court of appeals, like the trial court here, held that, because Facebook stores user information in the regular course of business, its records may be self-authenticated, in part at least, under Fed. R. Evid. 902(11) and 803(6). But the court in *Hassan* reached this conclusion without a detailed analysis of the requirements of Rules 902(11) and 803(6).

¶ 20 In *People in Interest of R.D.H.*, 944 P.2d 660, 665 (Colo. App. 1997), a division of this court discussed the application of the business records hearsay exception to statements made, as here, by individuals who were not part of the business itself:

business records exception to the rule against hearsay. *See* CRE 803(6); *Schmutz v. Bolles*, 800 P.2d 1307, 1312 (Colo. 1990).

2. The matters referenced in CRE 902(11)(a), (b), and (c) are identical to those which must be shown to admit into evidence material under the

Statements by an outside party included within a business record are not necessarily granted the presumption of accuracy that attaches to statements made in the regular course of business because the outside party does not have a business duty to report the information. However, records containing such information are admissible when, as here, the information is provided as part of a business relationship between a business and an outsider and there is evidence that the business substantially relied upon the information contained in the records.

*Id.* at 665.

¶ 21 Here, even though an arguable business relationship exists between Facebook and its users, there was no evidence presented that Facebook substantially relies for any business purpose on information contained in its users' profiles and communications. Thus, as defendant correctly points out, the Facebook printouts were neither authenticatable under CRE 902(11) nor admissible under CRE 803(6).

¶ 22 That conclusion does not, however, end our inquiry, for an appellate court "may affirm a [district] court's ruling on grounds different from those employed by that court, as long as they are supported by the record." *People v. Chase*, 2013 COA 27, ¶ 17, ⸺ P.3d ⸺; *see People v. Quintana*, 882 P.2d 1366, 1375 (Colo. 1994) ("A defendant's conviction will not be reversed if a trial court reaches the correct result although by an incorrect analysis.").

¶ 23 In the present case, the prosecutor claimed that the printouts were records of Facebook containing communications to and from defendant. To properly authenticate the printouts, the prosecution had to make two separate showings: (1) the records were those of Facebook and (2) the communications recorded therein were made by defendant.[3]

¶ 24 With respect to the first showing, as the trial court recognized here, Facebook records are analogous to phone records or emails. In Colorado, e-mails may be authen-

ticated under either CRE 901(b)(1), through testimony of a witness with knowledge that a matter is what it is claimed to be, or CRE 901(b)(4), through consideration of distinctive characteristics shown by an examination of their contents and substance in light of the circumstances of the case. *See Bernard*, ¶ 10.

¶ 25 Indeed, "jurisdictions across the country have recognized that electronic evidence may be authenticated in a number of different ways consistent with Federal Rule 901 and its various state analogs." *Tienda v. State*, 358 S.W.3d 633, 639 (Tex. Crim. App. 2012); *see also Moore v. State*, 295 Ga. 709, 763 S.E.2d 670, 674 (2014) (" 'Documents from electronic sources such as the printouts from a website like [Facebook] are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence.' " (quoting *Burgess v. State*, 292 Ga. 821, 742 S.E.2d 464, 467 (2013))).

¶ 26 To establish that a printout contains content from Facebook or another social networking website, courts have relied on testimony regarding how the records were obtained, the substance of the records themselves, and affidavits or testimony from employees of the social networking site. *See State v. Snow*, 437 S.W.3d 396, 402–03 (Mo. Ct. App. 2014) (mother's testimony established that she and defendant both had MySpace pages and that she had printed defendant's message to her from her MySpace page); *State v. Paster*, 15 N.E.3d 1252, 1258–59 (Ohio Ct. App. 2014) (police investigator's testimony that she printed out Facebook accounts sufficient under Rule 901 to authenticate printouts as coming from Facebook); *Laurentz v. State*, No. 01–12–00269–CR, 2013 WL 5604740, at *5 (Tex. Ct. App. Oct. 10, 2013) (unpublished opinion) (The proponent of Facebook records is not *required* to subpoena a Facebook employee or to directly link messages to the defendant's computer "in order to authenticate a nontraditional communication under Rule 901"; authentication is permissible "through other accepted manners of authentication under

---

3. Although the court erroneously relied on CRE 902(11) to establish the first showing, it recognized that the prosecutor would also have to make the second showing.

the rule, including the contents and characteristics of the messages and witness testimony."); *Campbell v. State*, 382 S.W.3d 545, 551 (Tex. Ct. App. 2012) (noting that, as an initial matter of authentication under Tex. R. Evid. 901, "the content of the messages themselves purport to be messages sent from a Facebook account bearing [the defendant]'s name to an account bearing [the victim]'s name"); *see also Griffin v. State*, 419 Md. 343, 19 A.3d 415, 428 (2011) (One possible method for authenticating a social networking profile is "to obtain information directly from the social networking website that links the establishment of the profile to the person who allegedly created it."); *Commonwealth v. Foster F.*, 86 Mass.App.Ct. 734, 20 N.E.3d 967, 971 (2014) (Facebook records adequately authenticated where the prosecutor offered, among other things, the Facebook communications themselves and "an affidavit from the Facebook keeper of records"); *People v. Clevenstine*, 68 A.D.3d 1448, 1450–51, 891 N.Y.S.2d 511 (N.Y. App. Div. 2009) (testimony of MySpace officer established that records came from a MySpace account registered to the defendant).

¶ 27 Here, the lead detective testified that he had subpoenaed records of defendant's Facebook activity, and that Facebook complied with the subpoena and sent the detective compact discs containing the requested records. A police volunteer then sorted through these records to determine if they contained anything relevant to the murder. The printout presented to the court and the jury was of the relevant pieces of the electronic record. Further, the court admitted the unchallenged affidavit of a records custodian of Facebook certifying that the records were from the account linked to the defendant and stating that they had been created "at or near the time the information was transmitted by the Facebook user" and had been kept by Facebook's "automated system." Under the circumstances, we conclude that sufficient evidence was presented under CRE 901(b) upon which to conclude that the printouts contained content from Facebook.[4]

¶ 28 But, as mentioned above, that was not the only matter that had to be authenticated.

The prosecution also had to show that the Facebook pages were linked to defendant. *See Hassan*, 742 F.3d at 132–33 (That the Facebook pages were authenticated "was not . . . the end of the trial court's inquiry. The court also required the government, pursuant to Rule 901, to prove that the Facebook pages were linked to [the two defendants].").

¶ 29 Indeed, the primary authentication issue posed by the admission of Facebook records appears to be the identity of the author of recorded communications:

> First, because anyone can establish a fictitious profile under any name, the person viewing the profile has no way of knowing whether the profile is legitimate. Second, because a person may gain access to another person's account by obtaining the user's name and password, the person viewing communications on or from an account profile cannot be certain that the author is in fact the profile owner.

*Campbell*, 382 S.W.3d at 550 (citations omitted).

¶ 30 In light of these concerns, several jurisdictions have concluded that where a message is posted on a social networking website, additional corroborating evidence of authorship is required beyond confirmation that the social networking account is registered to the party purporting to create those messages. *See Commonwealth v. Purdy*, 459 Mass. 442, 945 N.E.2d 372, 381 (2011) (a message sent from Facebook account bearing a defendant's name cannot be sufficiently authenticated without additional "confirming circumstances" indicating that defendant was the author); *Smith v. State*, 136 So.3d 424, 433 (Miss. 2014) ("[S]omething more than simply a name and [a] small, blurry photograph purporting to be [the defendant] is needed to identify the Facebook account as his in the first place."); *Campbell*, 382 S.W.3d at 550 ("[T]he fact that an electronic communication on its face purports to originate from a certain person's social networking account is generally insufficient standing alone to authenticate that person as the author of the communication.").

---

4. It was, indeed, uncontested that the printouts    contained information from Facebook.

¶ 31 Many jurisdictions have articulated a similar requirement for the authentication of other electronic communications, including text messages or e-mails. *See State v. Koch,* 157 Idaho 89, 334 P.3d 280, 288 (2014) ("[E]stablishing the identity of the author of a text message or email through the use of corroborating evidence is critical to satisfying the authentication requirement for admissibility."); *Tienda,* 358 S.W.3d at 641–42 ("That an email on its face purports to come from a certain person's email address, that the respondent in an internet chat room dialogue purports to identify himself, or that a text message emanates from a cell phone number assigned to the purported author—none of these circumstances, without more, has typically been regarded as sufficient to support a finding of authenticity."); *State v. Lampman,* 190 Vt. 512, 22 A.3d 506, 516 (2011) (origin of allegedly threatening text messages from victim to defendant would need to be shown to lay foundation for question involving contents of messages); *see also Smith,* 136 So.3d at 433 (citing with approval *Tienda,* 358 S.W.3d at 642, for the idea that "something more" is needed when authentication of electronic communication is at issue).

¶ 32 At trial, various teens admitted to making the statements recorded on the printouts. And, as to defendant, prior to admission of the records, the prosecutor elicited the following information regarding defendant's identity as the author of messages attributed to him on the account registered to "Julius Glover" (the only account from which printouts were admitted):

- The account was registered to "Julius Glover," defendant's middle and last name;
- There were photos of defendant on the profile of the account;
- The detective testified that K.M. had identified the account as belonging to defendant and as one on which she had communicated with him;
- Defendant had provided his actual phone number when creating the account, which was verified by Facebook;
- R.D. testified that he spoke with defendant regarding the murder on Facebook and in person; he remembered making

and receiving most of the communications in question; and, he never thought that he was talking to someone other than defendant; and,

- Defendant went by the nickname "Brooklyn," a name people, including the victim, used to refer to him in the Facebook conversations.

¶ 33 Notably, no evidence suggested that anyone other than defendant ever used his account. Under the circumstances, we conclude that, under CRE 901(b), the trial court did not abuse its discretion in ruling the evidence was sufficient to permit the jury to conclude that the account belonged to defendant and that he sent the messages contained in the printouts. *See Bernard,* ¶¶ 11–13 (email properly authenticated under CRE 901(b)(1) and (b)(4) where victim testified that a printout was a true and accurate copy of an email she received from defendant and defendant did not challenge that the e-mail came from his e-mail address or that he sent it); *Burgess v. State,* 292 Ga. 821, 742 S.E.2d 464, 467 (2013) (police officer's testimony that MySpace profile contained pictures of the defendant, used his known nickname, and contained other verifiable personal information about him was sufficient to authenticate printouts from profile); *see also Smith,* 136 So.3d at 433 (identity of a purported sender may be shown by evidence that he or she responded to an exchange in such a way as to indicate circumstantially that he or she was in fact the author of the communication).

¶ 34 Consequently, we conclude (albeit for different reasons) that the trial court properly concluded that the printouts were sufficiently authenticated for purposes of admitting them into evidence.

### B. Hearsay

¶ 35 Defendant also asserts that the Facebook records were inadmissible hearsay. We disagree, but again, on grounds different from those upon which the trial court relied.

¶ 36 The statements in the Facebook printout which are at issue here were made in three different contexts:

(1) Defendant posted a status update using the victim's name and stating "didnt

i tell you to stay off my fuckn post yesterday? but u dont listen so if i c u today imam beat the shit outta u. i dont wanna talk n im not accepting any apologies. i told u to mind your fuckin buisiness and fall bacc but as soon as [E.E., another street teen] comments on my post hea u go so now its over for u."

(2) R.D. sent a message to defendant stating "hey found some info on [the victim] can i get a go head on that red light or do you want me to chill and jus wait for u to do it fam." The next day, defendant responded with "Yoo," and R.D. replied "what up og I meetin some people tomarrow to find out the info on [the victim] is there still a green light on his head?" Defendant responded, "hell yeah I need ur number asap"; and

(3) The day after the murder, R.D. and defendant started a conversation that continued, on and off, for several days. During that conversation:

• R.D. stated that someone named John said "he and a homie would take care of [the victim]" and that he was "learnin more now," to which defendant responded "wat? ? ? ? ?"

• Three days after the murder, R.D. told defendant that "they got [Rowland] bro," to which defendant responded, "ok." R.D. asked defendant, "so tell me brook what do we do now[?]," to which defendant responded "we don't do shytt we juss chill." R.D. replied, "okay that's what i have been doing these pigs think i have something to tell but i don't drop dimes like [E.E.]"; and,

• R.D. and defendant agreed to "drop" E.E., who was a "snitch" and had been talking to police; similarly, defendant told R.D. to "stop fuckin wit" another woman who was "going around sayin i [defendant] had sumthn to do with [the victim's] death."

¶ 37 Evidence is hearsay if it is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). "If a statement is hearsay, it is inadmissible unless it falls within an exception to the hearsay rule." *People v. Welsh*, 176 P.3d 781, 790 (Colo. App. 2007) (citing CRE 802).

¶ 38 As is evident from our previous discussion, we agree with defendant's assertion that the statements recorded in the printouts were not admissible under the business records exception to the rule against hearsay, CRE 803(6). We also reject the People's position that the exchange between R.D. and defendant regarding whether a "green light" on the victim still existed did not encompass any hearsay simply because "[q]uestions and commands generally are not intended as assertions, and therefore cannot constitute hearsay," *see United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006). Here, although defendant's response included a command, it also included an affirmative assertion of fact, the truth of which the prosecution wanted to prove, that is, that the green light on the victim still existed.

¶ 39 Nonetheless, we conclude that the statements recorded in the Facebook printouts were admissible. The trial court ruled that the statements from defendant's Facebook might be admissible as admissions, but only if the prosecutor established that the Facebook page belonged to defendant.

¶ 40 Under CRE 801(d)(2)(A), a statement made by a party is not hearsay if it is offered against that party. CRE 801(d)(2)(A). To admit a statement under this rule, the proponent must prove by a preponderance of the evidence that it was the opposing party who made the statement. *See United States v. Lang*, 364 F.3d 1210, 1222 (10th Cir. 2004) (using preponderance of evidence standard to assess admissibility under identical federal rule, Fed. R. Evid. 801(d)(2)(A)), *vacated on other grounds*, 543 U.S. 1108, 125 S.Ct. 986, 160 L.Ed.2d 1034 (2005), *and reinstated in part*, 405 F.3d 1060 (10th Cir. 2005); *People v. Montoya*, 753 P.2d 729, 733 (Colo. 1988) (preponderance of evidence is the traditional standard applicable to the resolution of most preliminary questions of admissibility, including under CRE 801(d)(2)(E)).

¶ 41 Here, as noted earlier, the court required the prosecution to prove that the ac-

count belonged to defendant and that defendant authored the messages in the printout. Although it did not explicitly reference the preponderance of evidence standard, its conclusions indicate that it was convinced by the evidence that both of these conditions were satisfied. Consequently, we perceive no error in the admission of defendant's statements. *See People v. Walford,* 716 P.2d 137, 140 (Colo. App. 1985) (lack of complete certainty regarding identification of defendant goes to the weight of the evidence, not its admissibility).[5]

¶ 42 As to statements made by others in the records, they were not hearsay because they were admitted to give context to defendant's statements. *See People v. Arnold,* 826 P.2d 365, 366 (Colo. App. 1991) (Statements "offered for the sole and limited purpose of putting the responses of the defendant in context and making them understandable to the jury, and not for the truth of their content"; with context statements, "reliability or truth is not at issue. The only pertinent fact is that they were made"); *see also People v. Hagos,* 250 P.3d 596, 623 (Colo. App. 2009) (the defendant's own statements during phone calls could be admitted under CRE 801(d)(2)(A); the statements of the victim on those calls were not hearsay as they only put the defendant's responses in context); *People v. Isom,* 140 P.3d 100, 103 (Colo. App. 2005) (interviewer's videotaped questions and statements were offered solely to place the victim's statements into context and were thus not hearsay); *People v. Gable,* 647 P.2d 246, 255 (Colo. App. 1982) (six taped conversations between the defendant and co-conspirators which implicated defendant contained only nonhearsay statements—those by the defendant and those of other parties introduced "to place [the] defendant's own statements in context, and make them intelligible to the jury").

¶ 43 Consequently, we conclude, albeit on grounds not articulated by the trial court, that the printouts of defendant's Facebook were properly admitted over defendant's hearsay objection. *See People v. Holmes,* 959 P.2d 406, 409 (Colo. 1998) (a correct judgment may be upheld on any ground supported by the record).

## III. Lay versus Expert Testimony

¶ 44 We also reject defendant's contention that reversal is required because the lead police detective on the case gave unendorsed expert testimony.

¶ 45 When laying a foundation for admission of the Facebook records, the detective testified that he was familiar with some of the features of Facebook through reading Facebook records "over the course of different investigations." He stated that when a person signs up for a Facebook account, a user may add information, including the user's phone number. He explained that Facebook has a "chat feature," where a user can directly message another user, and which allows for status updates.

¶ 46 The detective also testified that, based on his "investigation experience," he was familiar with some of the "street slang" used in the Facebook conversations. In explaining the meaning of some of the Facebook posts, the detective testified as to his "understanding" of some of the terms, including that "fam" meant the street family, "wea at" meant "we are at," "he bitched out" meant that the person ran away, and "we still havin 5" was a reference to a meeting somewhere to talk.

¶ 47 Because defendant did not object to the detective's testimony as that of an unendorsed expert, reversal is warranted

---

5. Some of defendant's statements would, alternatively, be admissible as indicating intent, plan, motive, or design under the state of mind exception to the rule against hearsay, CRE 803(3). For example, when R.D. asked defendant, after informing him that Rowland had been arrested, what they should do, defendant told him "we dont do shytt we juss chill"; the two "talked" about "drop[ping]" one individual who was a "snitch" and had been talking to police; and, defendant told R.D. to "stop fuckin wit" a woman who was "going around sayin i [defendant] had sumthn to do with [the victim's] death." These statements reveal a plan, on R.D.'s and defendant's part, to lay low after Rowland's arrest, give no information to police, and disassociate themselves from people who were talking to police.

only for plain error. *People v. Ujaama*, 2012 COA 36, ¶ 38, 302 P.3d 296.

In *Ujaama*, the division noted that "[p]lain error is strong medicine." It should provide a basis for relief only on rare occasions because (1) it is difficult to "fault a trial court for failing to rule on an issue that had not been presented to it," and (2) an accused should not be able to "withhold his objections until completion of his trial ... and later complain of matters which, if he had made a timely objection, would have allowed the trial court to take corrective action."

Consequently, relief under the plain error doctrine is limited to certain types of errors, having a certain type of effect.

*Id.* at ¶¶ 40–41 (quoting *United States v. Simmonds*, 931 F.2d 685, 687–88 (10th Cir. 1991), and *People v. Rollins*, 892 P.2d 866, 874 n. 13 (Colo. 1995)).

¶ 48 To qualify as plain error, an error must be both "obvious and substantial." *Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116. This means that an error must be so clear-cut that a trial judge should have been able to avoid it without benefit of objection, *People v. Pollard*, 2013 COA 31, ¶ 39, 307 P.3d 1124, and that it must be "seriously prejudicial," that is, it must have so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the defendant's conviction, *Ujaama*, ¶ 43; *see also Hagos*, ¶ 14.

¶ 49 We perceive no such error here.

¶ 50 CRE 701 provides that a lay witness's "testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." In contrast, CRE 702 provides that an expert qualified by "knowledge, skill, experience, training or education" may present opinions based on "scientific, technical, or other specialized knowledge" if it will assist the trier of fact.

¶ 51 "[T]he critical inquiry," in differentiating between lay and expert testimony, "is whether a witness's testimony is based on 'specialized knowledge.'" *People v. Rincon*, 140 P.3d 976, 982 (Colo. App. 2005). To determine if an opinion is based on "specialized knowledge," courts consider whether (1) ordinary citizens can be expected to have known of the information or have had the experiences that form the basis of the opinion and (2) the opinion resulted "from 'a process of reasoning familiar in everyday life' or 'a process of reasoning which can be mastered only by specialists in the field.'" *Id.* at 983. "In assessing whether an opinion is one which could be reached by any ordinary person, courts consider whether ordinary citizens can be expected to know certain information or to have had certain experiences." *Id.* (internal quotation marks omitted).

¶ 52 Here, the detective's understanding of Facebook and its features does not appear to have been the result of any specialized knowledge; rather, it appears to have been based on an investigation uncovering information, experience, or knowledge common among ordinary people using, or considering the use of, Facebook.[6] Therefore, this feature of the detective's testimony was, without doubt, lay testimony.

¶ 53 The detective's testimony about the meaning of several terms of "street slang" presents a somewhat closer question. Still, the meaning of the terms, we believe, can be determined "from a process of reasoning familiar in everyday life," rather than "a process of reasoning which can be mastered only

---

6. Indeed, many people today either have a Facebook account or know generally of its features, such as messaging and photo sharing. *See Antares Mgmt. LLC v. Galt Global Capital, Inc.*, No. 12– CV–6075 (TPG), 2013 WL 1209799, at *1 n. 1 (S.D.N.Y. Mar. 22, 2013) (unpublished decision) ("The court takes *sua sponte* judicial notice of Facebook Inc.'s international popularity and widespread influence. As the *New York Times* describes it, Facebook, by some measurements, is the most popular social network. With 175 million active users worldwide, it is one of the fastest-growing and best-known sites on the Internet today."); *Khoury v. ConAgra Foods, Inc.*, 368 S.W.3d 189, 200 n. 9 (Mo. Ct. App. 2012) ("*Facebook* is a popular Internet social networking website operated by Facebook, Inc.").

by specialists in the field." The process of reasoning supporting the conclusion that the detective's testimony was, again, lay testimony, is this: ascertaining the meaning of a term from the context in which it was used.[7]

 ¶ 54 Further, any error resulting from the detective's testimony was neither "obvious"[8] nor "seriously prejudicial." Consequently, we perceive no basis for reversing defendant's conviction based on this testimony.

### IV. Cumulative Error

¶ 55 Finally, because we have found, at most, one error—and it would not warrant reversal—defendant is not entitled to reversal on a theory of cumulative error.

### V. Conclusion

¶ 56 The judgment of conviction is affirmed.

JUDGE WEBB and JUDGE RICHMAN concur.

---

7. The record also suggests that he may have learned the meaning through another method often used by ordinary people, i.e., asking those who use a term to explain its meaning. For example, he related that he asked a witness what that witness understood the term "green light" to mean.

8. For error to be "obvious," for purposes of the plain error rule, an action must ordinarily contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law. *People v. Pollard*, 2013 COA 31, ¶ 40, 307 P.3d 1124. None of these circumstances has been shown to exist here.