23CA0959 Peo v Sanchez 10-23-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0959
City and County of Denver District Court No. 21CR7590
Honorable Jay S. Grant, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Karl A. Sanchez,

Defendant-Appellant.

---

JUDGMENT AND ORDER AFFIRMED

Division IV
Opinion by JUDGE SCHOCK
Harris and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 23, 2025

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Christina Van Wagenen,
Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Karl A. Sanchez, appeals his convictions for criminal negligence resulting in serious bodily injury to an at-risk person, theft from an at-risk person of $500 or more, and offering a false instrument for recording.  He argues that (1) the district court erred by failing to dismiss two jurors for cause; (2) the evidence was insufficient to sustain the theft conviction; and (3) the court admitted business records without proper authentication.  He also contends that the restitution order must be vacated along with the theft conviction.  We affirm the judgment and the restitution order.

## I.     Background

¶ 2     Sanchez lived with his elderly mother, Betty Lue Sanchez,[1] in her longtime home.  Betty was showing signs of cognitive decline, and Sanchez told his family he would serve as her caregiver.

¶ 3     Several months after Sanchez moved into Betty's home, he asked his friend, Jennifer Wesson, for help caring for Betty, and Wesson agreed.  When Wesson went to the home, Betty's bedroom "didn't look like the rest of the house."  While the house was

---

[1] The record contains different spellings of the victim's name: "Betty Lue Sanchez" and "Betty Lou Sanchez."  We use the spelling used on her medical records.  Because she shares the defendant's last name, we refer to her by her first name, intending no disrespect.

generally well kept, Betty's room was "super cluttered" and smelled strongly of feces.  Betty was in her bed — a twin bed with one sheet and a "very teeny blanket" — with dried feces on her hands.  The bed, the rug, and Betty's clothing were all soiled with urine and feces, and Betty had a bedsore on her tailbone.  Wesson cleaned the bedroom and helped Betty shower and change into clean clothes.

¶ 4     Days later, Wesson returned to the home to bring Betty sheets, a warm blanket, lights, and a heater.  When she arrived, Betty was stuck under her bed, again covered in feces.  Sanchez told Wesson that Betty had been under the bed for "[a] couple days . . . [s]ince the last time [Wesson] was there."  Wesson helped Betty get out from under the bed, showered her, and put a diaper on her.  She asked Sanchez if Betty could go to the hospital, but Sanchez said he was "afraid of what the neighbors would think."

¶ 5     Wesson returned two days later and again found Betty "soiled," wearing the same diaper Wesson had put on her during her previous visit.  This time, Sanchez agreed to let Wesson take Betty to the hospital.  Betty was admitted to the intensive care unit.  She was in shock as a result of diabetic ketoacidosis (a high level of acid in her blood), an infection, and severe dehydration.  She was

also showing signs of extended malnourishment and had several injuries, including bruising to her hip and buttocks, an infection in her ankle, and abrasions on her perineum. Concerned about neglect, the doctor reported Betty's condition to law enforcement.

¶ 6 The ensuing investigation revealed that Betty had previously granted Sanchez a durable power of attorney (POA) over her finances. Two months earlier, Betty had received an inheritance of approximately $70,000. Ten days after the funds were deposited into Betty's account, Sanchez withdrew a $36,500 cashier's check, which he used to buy a truck. Three days later, he withdrew an additional $27,733 as a cashier's check and $3,000 in cash. The investigating detective also discovered a recorded deed, which he believed had been backdated, gifting Betty's home to Sanchez.

¶ 7 Sanchez was charged with criminal negligence resulting in serious bodily injury to an at-risk person, theft from an at-risk person of $500 or more (for the withdrawals from Betty's bank account), and offering a false instrument for recording (for the allegedly backdated deed), as well as a crime of violence sentence enhancer. Sanchez was convicted by a jury on all counts and

sentenced to four years in the custody of the Department of Corrections. He was also ordered to pay restitution.

## II. Denial of Juror Challenges for Cause

¶ 8 Sanchez first contends that the district court abused its discretion by denying his challenges for cause of two jurors who expressed sympathy for elderly crime victims. We disagree.

### A. Additional Background

¶ 9 At the beginning of voir dire, the district court instructed the jury on "a few basic rules of law that apply in all criminal cases." One of those instructions was: "Sympathy and prejudice have no place in a criminal trial. The guilt or innocence of the defendant must not be decided as a result of either sympathy or prejudice for or against the [p]rosecution or the defendant." The court then asked the venire if there was "anyone who cannot follow these rules as I've laid them out." No one responded that they could not.

¶ 10 During voir dire, the prosecutor told the jury that the charges involved crimes against an at-risk person and asked if hearing that gave anyone concerns or "caused them to feel any sort of way whatsoever just by what the allegations are." No one responded.

¶ 11    Defense counsel then followed up on this line of inquiry, asking the prospective jurors if there was anyone who, "after you heard that the victim in this case was elderly[,] . . . automatically felt a sense of protectiveness or sympathy towards her." Several jurors raised their hands, including Juror L.C. and Juror W.

¶ 12    Juror L.C. explained that he raised his hand because most of his landscaping business clients are elderly. He added, "I see how they can't really do things for themselves as much as they used to, and, and that does give me — I do have some sympathy for the elderly." Defense counsel then asked Juror L.C. how he felt learning he might hear evidence that the victim suffered serious bodily injury. Juror L.C. responded that he felt sympathy for the victim, "[b]ut the evidence does need to be given that it for sure happened." When asked if evidence of serious bodily injury would make him feel biased toward one side or the other, Juror L.C. said, "Until completely proven guilty or innocent, then I can't really start with either one." But he reiterated that he would "feel sympathy."

¶ 13    Juror W. also said he would "feel either bias or sympathy" if he heard evidence of serious bodily injury. He elaborated:

I guess I just think about my own grandmother. . . . And if anybody were to harm her or take advantage of her in any sort of way, that would make me pretty angry. And I just think about somebody else doing that, and it makes me kind of angry as well.

¶ 14     At the close of voir dire, before hearing defense counsel's challenges for cause, the district court explained:

[Y]ou're probably going to strike the entire panel. I'm going to tell you that the way that the questions were asked about people having sympathy, you'd have to be inhumane to not have sympathy.

. . . [Y]ou were asked the narrative of, [i]f you heard that . . . an at-risk adult had serious bodily injury, would you have sympathy? How could a person not? And you stated, without anything more.

. . . .

You did not follow up with, how would that affect your deliberations? Would you . . . not be able to follow the law? So I'm just letting you know what . . . my position is on those.

¶ 15     Defense counsel acknowledged that "there is a level of humanity" that comes into play with an elderly victim. But she argued that her use of the qualifier, "without hearing more," meant that jurors who responded in the affirmative were inappropriately starting the trial with "protectiveness or sympathy" for the victim.

6

The district court again pointed out that defense counsel had not followed up by asking the prospective jurors if their expressed sympathy would affect their verdict or their ability to be impartial.

¶ 16    Defense counsel then moved to strike Juror L.C. and Juror W. (and other jurors who had similarly expressed sympathy for an elderly or at-risk victim) for cause. The district court denied the challenges, and Juror L.C. and Juror W. served on the jury.

### B.    Applicable Law and Standard of Review

¶ 17    Defendants have a constitutional right to a fair trial by an impartial jury. *People v. Abu-Nantambu-El*, 2019 CO 106, ¶ 14. To protect this right, the court must sustain a challenge for cause to a juror who has "a state of mind . . . evincing enmity or bias toward the defendant or the state." § 16-10-103(1)(j), C.R.S. 2025; *see Marko v. People*, 2018 CO 97, ¶ 20. But a juror who has expressed bias shall not be removed for cause "if the court is satisfied, from the examination of the juror or from other evidence, that [the juror] will render an impartial verdict according to the law and the evidence submitted to the jury at the trial." § 16-10-103(1)(j).

¶ 18    Thus, "[a] prospective juror's expression of concern or indication that he or she possesses a preconceived belief as to some

aspect of the case does not . . . mandate exclusion of that juror for cause." *Marko*, ¶ 21. Rather, in determining whether a prospective juror will impartially follow the law, the district court must evaluate the juror's state of mind based on their responses, demeanor, and body language throughout voir dire. *Id.* Absent rehabilitation, a challenge for cause must be granted when the juror's statements "compel the inference that he or she cannot decide crucial issues fairly." *People v. Merrow*, 181 P.3d 319, 321 (Colo. App. 2007).

¶ 19 We review the district court's denial of a challenge for cause for an abuse of discretion. *Marko*, ¶ 22. In doing so, we grant the district court great deference because it is in "a superior position to evaluate the 'juror's credibility, demeanor, and sincerity.'" *Id.* (citation omitted). And we consider the district court's ruling in the context of the entire voir dire. *People v. Ambrose*, 2021 COA 62, ¶ 30. A district court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair. *Marko*, ¶ 22.

### C. Analysis

¶ 20 We are not persuaded that Juror L.C.'s and Juror W.'s statements, read in context, alone evinced a bias against Sanchez or for the prosecution that required the jurors' dismissal for cause.

¶ 21    Both Juror L.C. and Juror W. acknowledged their unremarkable instinct to feel sympathy toward an elderly victim who was seriously injured, with Juror W. adding that it would make him "kind of angry." But as the district court noted, neither juror indicated that this sympathy would influence his verdict or his assessment of the evidence. They did not, for example, suggest they were more likely to believe an elderly victim or less likely to believe a person accused of such a crime. *See People v. Gulyas*, 2022 COA 34, ¶ 24 (juror said he would believe a child witness "[p]robably 90 percent of the time"); *Merrow*, 181 P.3d at 321 (juror said she would not "count the testimony of anybody who's under the influence"). Nor did either suggest he would be unable to follow the law or apply the presumption of innocence. *See People v. Wilson*, 114 P.3d 19, 24 (Colo. App. 2004) (juror said the defendant had "a strike against him" because of juror's past experience with alcohol abuse).

¶ 22    To the contrary, Juror L.C. expressly qualified his statement by explaining that "the evidence does need to be given that [a crime] for sure happened." And when asked if he would feel biased toward one side or the other, he confirmed — albeit, inartfully — that he would not make a decision until he saw the proof. *See People v.*

9

*Garcia*, 2018 COA 180, ¶ 22 ("A trial court may give substantial weight to a potential juror's assertion that he could be fair and impartial."); *People v. Simon*, 100 P.3d 487, 492–93 (Colo. App. 2004) (holding that juror's expressed "sympathy for the victim" did not require removal for cause where juror said she would "base her decision on the evidence presented"). Although Juror W. did not make any affirmative representations to this effect, neither he nor Juror L.C. responded when the court asked if anyone was unable to follow its instructions — including that "[t]he guilt or innocence of the defendant must not be decided as a result of . . . sympathy."

¶ 23    The right to a fair and impartial jury does not prohibit jurors from feeling sympathy toward a sympathetic situation or from candidly expressing that emotion during voir dire. *See id.* at 492. What it requires is that jurors are able to set aside that sympathy and make a decision based exclusively on the evidence and the court's instructions. *Id.* Juror L.C.'s and Juror W.'s acknowledgments that they would feel sympathy for a seriously injured elderly victim did not "compel the inference" that they could not do so. *Merrow*, 181 P.3d at 321. Rather, the district court could reasonably determine on this record that these statements

10

"simply reflect[ed] an honest effort to express feelings and convictions about matters of importance in an emotionally charged setting." *People v. Sandoval*, 733 P.2d 319, 321 (Colo. 1987).

¶ 24 Sanchez contends that Juror L.C.'s and Juror W.'s statements were sufficiently problematic as to at least require rehabilitation. *See Marko*, ¶ 25 (holding that juror was sufficiently rehabilitated after initially expressing concerns about following the law). But rehabilitative questioning is required only when a potential juror's statements otherwise "evince the sort of enmity or bias that warrants dismissal [of the juror] under [section] 16-10-103(1)(j)." *Merrow*, 181 P.3d at 321. Because Juror L.C.'s and Juror W.'s statements did not rise to this level, the district court could "deny [the] challenge[s] for cause without further inquiry." *Id.* For the same reason, we need not consider whether the court's pre-voir dire admonition that "[s]ympathy and prejudice have no place in a criminal trial" — and the jurors' failure to indicate they could not heed that instruction — could "preemptively rehabilitate" the jurors.

Absent statements raising "a genuine doubt about a potential juror's impartiality," no rehabilitation is necessary.[2]  *Garcia,* ¶ 21.

¶ 25    Finally, Sanchez also asserts that Juror L.C.'s statement that "[u]ntil completely proven guilty or innocent, then I can't really start with either one," indicated he could not uphold the presumption of innocence.  But Sanchez did not raise this as a ground for his challenge for cause in the district court.  *See People v. Russo,* 713 P.2d 356, 361 (Colo. 1986) ("[I]t is incumbent upon the challenging party to clearly state of record the particular ground on which a challenge for cause is made.").  By failing to do so, he waived it.  *See* Crim. P. 24(b)(2); *Richardson v. People,* 2020 CO 46, ¶ 25.

¶ 26    In any event, we do not view Juror L.C.'s statement as indicating that he was unable or unwilling to apply the law.  That statement was of course an inaccurate expression of the burden of proof: a defendant does not need to prove they are innocent, and a

---

[2] Sanchez also filed a pretrial motion to *limit* judicial rehabilitation of prospective jurors by asking them if they could set aside their personal beliefs and decide the case based solely on the evidence and the instructions.  Although defense counsel later clarified that she was merely asking the court to be "more conscientious and more careful" in its rehabilitation — not to forgo rehabilitation altogether — Sanchez's request was at least somewhat inconsistent with his argument on appeal that the court should have done more.

juror *does* start with innocence. But read in context, Juror L.C. was not trying to describe the presumption of innocence. He was simply attempting to explain that he would not prejudge the case. Indeed, his immediately preceding statement that evidence must be "given that it for sure happened" was consistent with the presumption of innocence and the prosecution's burden of proof.

¶ 27    Thus, the district court did not abuse its discretion by denying Sanchez's challenges for cause to Juror L.C. and Juror W.

### III.    Sufficiency of the Evidence for Theft

¶ 28    Sanchez next argues that the evidence was insufficient to support his theft conviction because there was no evidence he lacked authorization to withdraw Betty's funds. He also argues that because the restitution order was based on the theft conviction, the restitution order must be vacated as well. We again disagree.

### A.    Standard of Review and Applicable Law

¶ 29    In reviewing the sufficiency of the evidence, we review the record de novo to determine whether the evidence was sufficient both in quantity and quality to sustain the conviction. *Johnson v. People*, 2023 CO 7, ¶ 13. We do not "serve as a thirteenth juror and consider whether [we] might have reached a different conclusion."

*People v. Harrison*, 2020 CO 57, ¶ 33. Instead, we view the evidence as a whole and in the light most favorable to the prosecution to determine if it is "substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Johnson*, ¶ 13 (citation omitted).

¶ 30    As relevant to this case, "[a] person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization . . . and . . . [i]ntends to deprive the other person permanently of the use or benefit of the thing of value." § 18-4-401(1)(a), C.R.S. 2025. A person acts "without authorization" when "the owner of the property has not given him or her permission to obtain or exercise control over that property." *People v. Stell*, 2013 COA 149, ¶ 14.

## B.    Analysis

¶ 31    Sanchez's theft conviction was based on three withdrawals that he made from Betty's bank account: (1) a $36,500 cashier's check payable to a car dealership that he used to buy a truck; (2) a $27,733 cashier's check payable to himself; and (3) $3,000 in cash.

¶ 32    Sanchez does not dispute that he made the withdrawals. But he argues that the prosecution failed to prove that he lacked

14

authorization to do so because Betty had granted him a POA over her finances. More specifically, he cites provisions of the POA authorizing him to withdraw funds from Betty's accounts, write checks on the account, and pay for Betty's living expenses.

¶ 33     A power of attorney is "an instrument by which a principal confers express authority on an agent to perform certain acts or kinds of acts on the principal's behalf." *In re Tr. of Franzen*, 955 P.2d 1018, 1021 (Colo. 1998). But powers of attorney must be "strictly construed" according to their language and the surrounding circumstances. *Stell*, ¶¶ 17–18. And an agent acting under a power of attorney must act in accordance with the principal's reasonable expectations or in the principal's best interest; in good faith; and, unless otherwise provided, for the principal's benefit. *Id.* at ¶ 20; § 15-14-714(1)–(2) C.R.S. 2025.

¶ 34     This best interest standard and duty of loyalty were expressly incorporated into the terms of the POA. The POA designated Sanchez to "act as the Agent for [Betty's] benefit" and to "exercise powers in [Betty's] best interest and general welfare, as a fiduciary." Thus, the POA authorized Sanchez to spend Betty's money only to the extent he acted for Betty's benefit and in her best interest.

¶ 35    The evidence was sufficient to support a jury finding that he did not. First, the truck that Sanchez purchased with Betty's funds was titled in Sanchez's name alone. There was no indication that Betty ever drove it, and given her condition, it is reasonable to infer she never would. Moreover, Sanchez had another car at the time, suggesting that Betty had no need for the truck as a passenger either. Indeed, Wesson testified that when Sanchez finally agreed Betty could go to the hospital, Wesson drove her there in her own car. Viewing this evidence in the light most favorable to the prosecution, a jury could reasonably conclude that Sanchez bought the truck for himself — not Betty — and therefore that he acted without authorization in doing so. That purchase alone is sufficient to sustain Sanchez's conviction of theft of more than $500.

¶ 36    The evidence was also sufficient to support a finding that the other two withdrawals were not for Betty's benefit and in her best interest either. Sanchez highlights the lack of evidence as to how he spent the funds and suggests that he could have used the funds for Betty's benefit — including for home improvements or medical expenses. But Wesson testified that Betty was effectively living in an island of squalor in an otherwise well-kept home. There was

evidence that Sanchez blocked Betty's access to the kitchen and placed padlocks on the refrigerator and cupboards to prevent her from getting food. And by the time Betty was taken to the hospital, she was malnourished and her health was so dire that she was placed in the intensive care unit with a "life-threatening" condition.

¶ 37 From this evidence, a rational jury could reasonably infer that Sanchez did not use the withdrawn funds in Betty's best interest. *See Stell*, ¶ 21. To the extent the evidence could have supported a contrary conclusion, that was for the jury to decide. *See People v. Perez*, 2016 CO 12, ¶ 31 ("The jury, not the court, must perform the fact-finding function when conflicting evidence — and conflicting reasonable inferences — are presented."). Our role is limited to determining whether the record supports the jury's verdict. *Id.*

¶ 38 Sanchez also asserts that, even if the POA did not grant him authorization, the prosecution failed to prove that Betty did not *expressly* authorize his withdrawals. But several witnesses testified to Betty's severely declining mental state and diminished communication abilities around the time of the withdrawals. And as we have explained, Betty's physical health and living conditions were abysmal. Under these circumstances, the inference that Betty

17

did not authorize Sanchez to withdraw tens of thousands of dollars of her money for his own benefit does not rest on mere speculation. It is supported by a "logical and convincing connection" to the evidence. *People v. Trujillo*, 2025 COA 22, ¶ 20 (citation omitted).

¶ 39 We therefore conclude that the evidence was sufficient to support Sanchez's theft conviction. And because Sanchez's challenge to the restitution order is contingent on his theft conviction being vacated, we affirm the restitution order as well.

## IV. Admission of Records

¶ 40 Sanchez's final argument is that the district court erred by admitting records from an online legal document company based in Canada showing that he downloaded a gift deed in February 2021 — more than a year after the date on the deed gifting Betty's home to him. He asserts that the records were foreign business records that were not properly authenticated. We are not persuaded.

### A. Additional Background

¶ 41 During the investigation, Detective Kenneth Klaus discovered a recorded deed of gift of Betty's home from Betty to Sanchez. Although the deed was dated January 12, 2020, the document had a copyright date through 2021, which led Klaus to believe that the

18

deed had been backdated. He determined that the deed had been downloaded from "LawDepot.com" (LawDepot), and he subpoenaed LawDepot for records associated with Sanchez's email account.

¶ 42 In response, LawDepot produced four documents — a receipt for a subscription under Sanchez's name and email address on February 23, 2021; "user answer data" showing that the account downloaded a gift deed the same day; and two subsequent subscription renewal receipts — along with an affidavit from the custodian of records of "Sequiter Inc. trading as LawDepot," certifying the records' authenticity. The affidavit was signed in Canada and stated that the custodian was from Canada, but the subscription receipts listed a California address for the company.

¶ 43 The prosecution moved to admit the LawDepot documents under CRE 902(11) as certified domestic records of regularly conducted activity. Defense counsel objected on the ground that the records were not domestic records because LawDepot is based in Canada and the records were sent from there. The prosecution countered that the records were produced in response to a subpoena served on LawDepot's California office and concerned a United States subscriber. The district court overruled the objection

and admitted the records, concluding that the documents appeared to have been produced through a "domestic office" of LawDepot.

### B. Standard of Review and Applicable Law

¶ 44 We review a district court's evidentiary rulings, including as to authentication, for an abuse of discretion. *People v. Glover*, 2015 COA 16, ¶ 10. A court abuses its discretion if it "misconstrues or misapplies the law or otherwise reaches a manifestly arbitrary, unreasonable, or unfair result." *Id.* We review de novo the district court's "application or interpretation of the law when making an evidentiary ruling." *People v. Dominguez*, 2019 COA 78, ¶ 13.

¶ 45 Authentication requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." CRE 901(a). The standard for authentication is "minimal — all that's required is a prima facie showing that the evidence is what its proponent claims." *Gonzales v. People*, 2020 CO 71, ¶ 42. This burden is satisfied if "the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *Id.* at ¶ 27 (citation omitted).

¶ 46 There are various paths to authentication. *See Glover*, ¶ 14. For example, a record can be authenticated through the testimony

of a witness with knowledge or through the record's contents and distinctive characteristics, in conjunction with the circumstances. CRE 901(b)(1), (4). Alternatively, some categories of records are self-authenticating, meaning no extrinsic evidence of authenticity is required. CRE 902. One such category is domestic records of regularly conducted activity accompanied by a custodian affidavit. CRE 902(11). *Foreign* records of regularly conducted activity, however, are self-authenticating only in civil cases. CRE 902(12).

### C.  Analysis

¶ 47  The parties' arguments on appeal center on whether the LawDepot documents are "domestic" records that are self-authenticating or "foreign" records that are not. But we are not convinced it matters. *See People v. N.T.B.*, 2019 COA 150, ¶ 34 (holding that records were properly authenticated under CRE 901(b)(1) despite lack of CRE 902(11) certification); *Glover*, ¶¶ 21–24 (holding that user account records that did not satisfy CRE 902(11) were sufficiently authenticated under CRE 901(b)(1) and (4)).

¶ 48  Klaus testified that he subpoenaed LawDepot for records associated with Sanchez's email address and received the records at issue in response, along with an affidavit from a LawDepot

custodian certifying that the records were from the specified account. *See N.T.B.*, ¶ 34 (holding that detective had sufficient personal knowledge to authenticate records where detective served warrants, received records in response, and knew the defendant had an account tied to his email address); *Glover*, ¶ 27 (holding that similar testimony established authenticity of Facebook records).

¶ 49 Three of the documents were on LawDepot letterhead and included Sanchez's email address, and all four included Sanchez's name. Moreover, one of the records showed a query for a gift deed with the address of Betty's home, consistent with the LawDepot gift deed Betty granted to Sanchez. *See Glover*, ¶¶ 30, 32 (requiring corroborative evidence linking records to defendant); *cf. People v. Heisler*, 2017 COA 58, ¶ 12 (holding that social media communications may be authenticated through registration of the account to the sender and "any other confirming evidence"). This evidence was sufficient to permit a jury finding that the records were LawDepot records for Sanchez's account and that Sanchez made the query they reflected. *See N.T.B.*, ¶ 34; *Glover*, ¶ 33.

¶ 50 But even assuming CRE 902(11) was the only available path to authentication, the district court did not abuse its discretion by

concluding that the records were "domestic" records — that is, records from the United States.[3] *See* Black's Law Dictionary 612 (12th ed. 2024) (defining "domestic" as "[o]f, relating to, or involving one's own country"). Klaus testified that LawDepot's United States headquarters is in California, and the prosecution proffered that Klaus served the subpoena on LawDepot at its California address. The subscription receipts had a letterhead with the California address and identified the items ordered as "Trial Site Subscription (USA)" and "Site — Subscription Renewal (USA)." The "user answer data" also displayed "US" in the box labeled "Country." And the records were associated with a Colorado account. Indeed, nothing in the records themselves suggests any connection to Canada.

¶ 51 Sanchez nevertheless argues that the records are "foreign" because the affidavit was signed in Canada and the records custodian is Canadian. But CRE 902(11) does not require the records to be *certified* in the United States; it simply requires the records themselves to be domestic. And the fact that the records custodian happens to be in Canada does not mean the records

---

[3] Sanchez does not dispute that the LawDepot custodian affidavit satisfied the certification requirements of CRE 902(11).

themselves — electronic records for a United States account produced in response to a subpoena of LawDepot's United States office and bearing the address of that office — are Canadian. Rather, the district court could reasonably determine that such records are more closely connected to the United States.

¶ 52 Finally, to the extent Sanchez asserts that the records were inadmissible hearsay *because* they were not properly authenticated, he conflates these two distinct evidentiary rules. But in any event, his hearsay argument fails for the same reason. Even assuming the apparently computer-generated receipt and search result could be considered hearsay, *but see People v. Hamilton*, 2019 COA 101, ¶ 24, the business records hearsay exception may be satisfied by a certification that complies with CRE 902(11). CRE 803(6). Other than his argument that CRE 902(11) does not apply, Sanchez does not otherwise argue that the records failed to satisfy CRE 803(6).

¶ 53 The district court therefore did not abuse its discretion by admitting the LawDepot records.

## V. Disposition

¶ 54 The judgment and order are affirmed.

JUDGE HARRIS and JUDGE JOHNSON concur.