23CA0574 Peo v Reeves-Burrola 06-26-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0574
Weld County District Court No. 22CR86
Honorable Timothy Kerns, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jessica Reeves-Burrola,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE SCHOCK
Dunn and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 26, 2025

Philip J. Weiser, Attorney General, Josiah Beamish, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph Paul Hough, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Jessica Reeves-Burrola, appeals her convictions for first degree murder (extreme indifference), first degree assault, reckless endangerment, and illegal discharge of a firearm. She argues that the district court erred by (1) denying her motion to suppress Facebook records obtained through an overbroad search warrant; (2) admitting Facebook messages without proper authentication; (3) failing to give the jury a "multiple assailant" or "apparent necessity" instruction; and (4) instructing the jury on the provocation exception to self-defense. We affirm the judgment.

## I.    Background

¶ 2    During an evening gathering at an apartment, Reeves-Burrola knocked on the door, armed with a gun and accompanied by three other people. According to the resident of the apartment, when she and another man, Henry "Hank" Sandoval, opened the door and saw the gun, they immediately slammed the door shut. As they did, Reeves-Burrola shot through the door, hitting and killing Sandoval and striking another occupant, Ruben Moreno, in the arm.

¶ 3    Reeves-Burrola gave a different account of the shooting. According to her, Sandoval and others had attacked her and stolen her car about a week earlier. The morning of the shooting, Reeves-

1

Burrola had learned that her car had been recovered, but she was still missing her keys. So at the behest of a friend, she went to the apartment to retrieve her keys in exchange for an ounce of methamphetamine. Reeves-Burrola said that when the door opened, Sandoval and Moreno rushed toward her. As they did so, Sandoval pulled out a gun and shot at her, and she shot back.

¶ 4    Reeves-Burrola was charged with first degree murder for shooting Sandoval and attempted first degree murder and first degree assault for shooting Moreno, in addition to other counts. Testifying at trial, Reeves-Burrola admitted that she shot Sandoval and Moreno but claimed she had done so in self-defense.

¶ 5    The jury convicted Reeves-Burrola of first degree murder, first degree assault, illegal discharge of a firearm, and reckless endangerment (as a lesser included offense of attempted first degree murder). She was sentenced to life in prison without parole.

## II.    Motion to Suppress

¶ 6    Reeves-Burrola first contends that the district court erred by denying her motion to suppress Facebook records because the search warrant for those records was overbroad. We agree that the

warrant was not sufficiently particular, but we nevertheless affirm the denial of the motion to suppress under the good faith exception.

## A.    Additional Background

¶ 7    A couple days after the shooting, law enforcement received an anonymous tip that Reeves-Burrola had sent Facebook messages referring to the shooting and her stolen vehicle.  The tipster sent the detective a screenshot of the Facebook account and confirmed it belonged to Reeves-Burrola.  Based on that tip, the detective applied for and received a search warrant for records associated with the account.  The supporting affidavit said the detective was requesting a warrant for the account from December 20, 2021 (ten days before the shooting and the day before Reeves-Burrola reported her vehicle stolen), to January 3, 2022 (four days after the shooting), "in order to recover evidence of this murder investigation as well as Reeves-Burrola's assault and stolen vehicle."

¶ 8    But the warrant itself was not so limited.  Instead, the warrant identified twenty-three broad categories of information, including, among other things, profile information, email addresses, GPS locations, status update history, notes, shares, mini-feeds, wall posts, friend lists, group listings, events, video listings, applications,

3

messages, a user photoprint and user comments, private messages, and IP logs. The only categories that were limited by date were logins and the associated IP addresses, which were limited to a date range of December 20, 2021, through January 7, 2022.

¶ 9 Reeves-Burrola moved to suppress all evidence obtained from the search of her Facebook account on the grounds that the warrant was not supported by probable cause and was not sufficiently particular. She argued that the good faith exception did not apply because the language of the warrant was similar to the language of warrants the supreme court has deemed overbroad.

¶ 10 The district court acknowledged that, read in isolation, the warrant was overbroad. But it concluded that the warrant had to be read in the context of the affidavit, which "limit[ed] the duration and the nature of the information that was being sought." Based on those affidavits, the court ruled that the warrant was sufficiently particular, and it denied the motion to suppress. After hearing testimony from the lead detective, the court further found that, even if the warrant was invalid, the good faith exception would apply.

## B. Applicable Law and Standard of Review

¶ 11 The Fourth Amendment requires search warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also* Colo. Const. art. II, § 7. This requirement protects against "general, exploratory rummaging in a person's belongings" by ensuring that the search is "confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *People v. Seymour*, 2023 CO 53, ¶ 44 (citations omitted). A warrant without particularity is invalid. *People v. Coke*, 2020 CO 28, ¶ 38.

¶ 12 In some cases, a supporting affidavit may provide the requisite particularity that is not contained in the warrant itself. *People v. Staton*, 924 P.2d 127, 132 (Colo. 1996). For it to do so, three conditions must be satisfied: (1) the warrant must incorporate the affidavit by reference; (2) both documents must be presented to the issuing magistrate or judge; and (3) either the affidavit must accompany the warrant during the search or the search must be conducted under the supervision and control of the affiant. *Id.*

¶ 13 Generally, evidence seized under an overbroad warrant must be suppressed. *See Seymour*, ¶ 62; *Coke*, ¶ 38. But under the good

faith exception to the exclusionary rule, evidence should not be suppressed if officers "act[ed] in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate." *Seymour*, ¶ 63 (citation omitted); *see also* § 16-3-308(1), C.R.S. 2024. An officer's reliance on a warrant is unreasonable when, as relevant here, the warrant is "so facially deficient . . . in failing to particularize the place to be searched or the things to be seized . . . that the executing officers cannot reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984).

¶ 14 The district court's denial of a motion to suppress presents a mixed question of fact and law. *Seymour*, ¶ 19. We defer to the district court's factual findings if they are supported by competent evidence, but we review the legal effect of those findings de novo. *Id.* In particular, we review de novo whether a search warrant and supporting affidavit satisfied the particularity requirement and whether the good faith exception applies. *Pettigrew v. People*, 2022 CO 2, ¶ 49; *People v. Hagos*, 250 P.3d 596, 619 (Colo. App. 2009).

### C. Analysis

¶ 15 There can be little question that the Facebook warrant itself lacked the requisite particularity — and indeed, the People do not

6

argue otherwise.  Like the overbroad warrant in *Coke,* the warrant "contains no particularity as to the alleged victim or," with one exception, "to the time period during which the [crimes] allegedly occurred."  *Coke,* ¶ 38.  The only category with any date limitation is "Logins for dates between 12/20/2021 and 01/07/2022."  But the warrant also separately lists "IP Logs" with no date limitation.  And none of the other categories — which effectively comprise the entirety of the Facebook account — are limited by date either.

¶ 16　　Nor does the warrant identify the crime under investigation.  *Cf. United States v. Zelaya-Veliz,* 94 F.4th 321, 337 (4th Cir. 2024) (holding that broad warrant to search Facebook records was sufficiently particular because the seizure was limited to evidence of enumerated offenses); *United States v. Suggs,* 998 F.3d 1125, 1134 (10th Cir. 2021) ("[A] warrant may satisfy the particularity requirement if its text constrains the search to evidence of a specific crime . . . .").  Although the warrant quoted Crim. P. 41(b)'s requirement that the requested data was "designed or intended for use" or was or had "been used as a means of committing *a* criminal offense" and "would be material evidence in *a* subsequent criminal prosecution," it never said what that crime was.  C.R.C.P. 41(b)(2)-

7

(3), (5) (emphasis added); *see Mink v. Knox*, 613 F.3d 995, 1010-11 (10th Cir. 2010) (holding that citation to Crim. P. 41(b), without more, did not provide requisite particularity); *Suggs*, 998 F.3d at 1134-35 (holding that this language "provides no context from which to constrain the search to evidence of a specific crime").

¶ 17　By failing to do so, the warrant authorized officers to search the entire Facebook account — all messages, videos, photos, contact lists, posts, location data, and more — for evidence wholly unrelated to the crimes under investigation.　*See Coke*, ¶ 38.

¶ 18　Conflating the warrant and the supporting affidavit, the People rely entirely on the affidavit to provide the requisite particularity. Unlike the warrant, the affidavit did specify the crimes under investigation and a date range tethered to those crimes (though it also included the same list of unrestricted categories).　The problem is that the People do not argue that the *Staton* factors for incorporation of a curative affidavit are satisfied.　And they are not.

¶ 19　Most importantly, an affidavit can be used to satisfy the Fourth Amendment's particularity requirement only if the warrant incorporates the affidavit by reference.　*Staton*, 924 P.2d at 132.　It is not enough that the warrant mentions the affidavit; it must

*incorporate it* through "appropriate words of incorporation." *Groh v. Ramirez*, 540 U.S. 551, 558 (2004); *see also Suggs*, 998 F.3d at 1135. Such express incorporation is critical because "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Groh*, 540 U.S. at 557.

¶ 20    The warrant in this case mentions the affidavit only twice, once to say that an affidavit had been filed — "Detective Fidel Sanchez, having this date filed an Affidavit for a Search Warrant" — and once to again identify the affiant — "[t]he names of persons whose affidavits have been taken in support hereof are: Detective Fidel Sanchez." In neither instance did the warrant incorporate the affidavit or suggest that the affidavit further defined the scope of the search. *See id.* at 555-58 (holding that warrant did not incorporate affidavit where it "recite[d] that the Magistrate was satisfied the affidavit established probable cause"); *United States v. Tracey*, 597 F.3d 140, 149 (3d Cir. 2010) (holding that warrant did not incorporate affidavit where "a reader of the warrant would know that an affidavit is attached, but would have no indication that the attached affidavit limits the officers in their search"); *cf. Staton*, 924 P.2d at 132 (holding that warrant incorporated affidavit by twice

saying that the subject of the search was "*as described in the* [*affidavit*]"). Because the warrant did not incorporate the affidavit, we may not look to the affidavit to cure the deficient warrant.[1]

¶ 21 We nevertheless conclude for three reasons that the good faith exception applies. First, no Colorado case law has specifically addressed the degree of particularity required for a Facebook search warrant, and other courts have wrestled with this question. *See Zelaya-Veliz*, 94 F.4th at 340-41 (applying good faith exception based on "unsettled nature of whether a temporal limitation is required on a warrant authorizing the search and seizure of Facebook account data"). Absent such precedent, a reasonable officer would not necessarily have known that the warrant was unlawful despite the magistrate's authorization. *See id.*; *Seymour*, ¶ 70 (applying good faith exception based on "absence of precedent explicitly establishing" a constitutionally protected privacy interest).

¶ 22 Second, the detective who signed the affidavit also conducted the Facebook search. In that affidavit, he stated that he was

---

[1] We also note that, although the other two factors in *People v. Staton*, 924 P.2d 127 (Colo. 1996), appear to be satisfied based on the record, the People make no argument as to those factors either.

10

requesting a warrant for the Facebook account from "December 20th, 2021 – January 3rd, 202[2] in order to recover evidence of this murder investigation as well as Reeves-Burrola's assault and stolen vehicle."  The detective could have reasonably believed the scope of the warrant was limited to what he had requested.  *See United States v. Russian*, 848 F.3d 1239, 1246 (10th Cir. 2017) ("Although a warrant . . . affidavit cannot save a warrant from facial invalidity, it can support a finding of good faith, particularly where . . . the officer who prepared the . . . affidavit also executed the search.").  And consistent with that understanding, there is no indication in the record that the search exceeded that scope.

¶ 23　　Third, other divisions of this court have concluded that a search warrant *did* incorporate a supporting affidavit by cross-referencing it without using express words of incorporation.  *See, e.g., People v. Rodriguez-Ortiz*, 2025 COA 30, ¶¶ 29, 33 & n.2; *see also Chavez v. Chavez*, 2020 COA 70, ¶ 13 ("[D]ivisions are not bound by the decisions of other divisions . . . .").  A reasonable officer could have reached the same conclusion.

¶ 24　　Reeves-Burrola contends that the good faith exception should not apply because the warrant (1) was based on an anonymous tip

11

and (2) authorized a "largely unrestrained search of anything and everything related to [her] Facebook account." Reeves-Burrola's first argument goes to whether the affidavit was supported by probable cause — an issue she does not raise on appeal — not whether the warrant was sufficiently particular. *See People v. Leftwich*, 869 P.2d 1260, 1266-67 (Colo. 1994) (holding that anonymous letter did not establish probable cause).[2] As to her second argument, we agree, and that is why the warrant is invalid. But it does not refute our conclusion that the detective could have reasonably believed the warrant was limited by his affidavit.

¶ 25    Under these circumstances, we conclude that it was objectively reasonable for the detective to rely on the warrant — issued by a neutral and detached magistrate — even though we have determined that warrant to be invalid. *See Seymour*, ¶ 63; § 16-3-308(1)-(2)(a) (providing that evidence shall not be suppressed if it was seized as a result of "a reasonable judgmental error

---

[2] The affidavit also stated that, in addition to the anonymous tip, which referred to the shooting and Reeves-Burrola's stolen vehicle, the tipster sent the detective a screenshot of the account.

concerning the existence of facts or law"). We therefore affirm the district court's denial of Reeves-Burrola's motion to suppress.

### III. Authenticity of Facebook Records

¶ 26     Reeves-Burrola next argues that the district court erred by admitting Facebook messages into evidence without proper authentication. We disagree.

### A. Additional Background

¶ 27     Reeves-Burrola moved before trial to preclude the prosecution from relying on a certificate of authenticity from Facebook to self-authenticate the Facebook records. She argued that the certificate of authenticity could not establish the authenticity of those records under CRE 902(11) because the Facebook custodian did not have personal knowledge of the content of the records. Because the prosecution did not yet know what records it intended to introduce, the district court deferred ruling on the motion until trial.

¶ 28     At trial, the prosecution sought to admit the certificate of authenticity and a two-page Facebook message exchange between Reeves-Burrola and a third party, in which Reeves-Burrola referred to the shooting. The certificate of authenticity was signed by a Facebook custodian of records and attested, among other things,

that the records were "an exact copy of the records that were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook."

¶ 29     Reeves-Burrola objected to the certificate of authenticity and the underlying records, arguing that the records could be authenticated only through testimony from the Facebook custodian. Relying on *People v. Glover,* 2015 COA 16, the prosecution asserted that the records could be authenticated through (1) testimony from the lead detective that he had received the records from Facebook through a warrant and (2) evidence tying the account to Reeves-Burrola. The court ruled that, if the evidence was consistent with the prosecution's offer of proof, the records would be admitted.

¶ 30     The detective testified that he found a Facebook page in Reeves-Burrola's name with her profile picture that said she was from Greeley (where Reeves-Burrola lived). He requested records for that account through a court order and received those records from Facebook. When he received them, he recognized one of the email addresses associated with the account as an email address that Reeves-Burrola had admitted was hers in a jail call to her father.

¶ 31    The detective then testified about the message exchange between Reeves-Burrola and the third party, which occurred within hours of the shooting.  In the exchange, Reeves-Burrola says she "[f]ucked up by shooting a little bitch that fucking stole my keys," and "[H]ank stole my car after stomping on me . . . so I shot him."

¶ 32    The district court admitted the certificate of authenticity and the message exchange over Reeves-Burrola's objection.

B.    Standard of Review and Applicable Law

¶ 33    We review evidentiary rulings, including as to authentication, for an abuse of discretion.  *Glover*, ¶ 10.  A court abuses its discretion if it "misconstrues or misapplies the law or otherwise reaches a manifestly arbitrary, unreasonable, or unfair result."  *Id.*

¶ 34    Authentication requires "evidence sufficient to support a finding that the evidence in question is what its proponent claims."  *Id.* at ¶ 12; *see also* CRE 901(a).  The burden to authenticate "is not high — only a prima facie showing is required."  *Glover*, ¶ 13 (citation omitted).  A district court's role is not to decide definitively whether the evidence is authentic but "whether the proponent has offered a satisfactory foundation from which the jury could reasonably [so] find."  *Id.* (citation omitted).  If this standard is met,

the evidence should be admitted and "the fact finder determines its weight." *People in Interest of A.C.E-D.*, 2018 COA 157, ¶ 43.

¶ 35    The authentication of Facebook messages requires two showings: (1) that the records are those of Facebook and (2) that the communications were made by the purported sender. *Glover*, ¶ 23. The first showing can be made through the testimony of a witness with knowledge or consideration of the distinctive characteristics of the records. *Id.* at ¶ 24. Such evidence may include "testimony regarding how the records were obtained, the substance of the records themselves, and affidavits or testimony from employees of the social networking site." *Id.* at ¶ 26. The second showing requires "additional corroborating evidence of authorship . . . beyond confirmation that the [Facebook] account is registered to the party purporting to create those messages." *Id.* at ¶ 30. This standard is satisfied by testimony establishing any combination of the following factors:

(1)    the account was registered to the purported sender;

(2)    corroborative evidence showed that the account was used by the purported sender;

(3)    the substance of the communication was recognizable as being from the purported sender;

(4)    the sender "responded to an exchange in such a way as to indicate circumstantially that he or she was in fact the author of the communication"; and

(5)    any other confirming evidence under the circumstances.

*People v. Heisler*, 2017 COA 58, ¶ 12 (citation omitted).

### C.    Analysis

¶ 36    The district court did not abuse its discretion by concluding that the prosecution cleared the low hurdle of authentication.

¶ 37    First, Reeves-Burrola does not dispute that the evidence was sufficient to show that the records came from Facebook. *See Glover*, ¶ 23. As in *Glover*, the detective testified that he received the records from Facebook in response to the warrant. *See id.* at ¶ 27. He also testified that he reviewed the records when he received them and that the message exchange was part of those records. And the records were accompanied by the certificate of authenticity, which stated that the records were an exact copy of records made and kept by Facebook's automated systems. *See id.* Reeves-Burrola does not challenge the admission of that certificate

17

of authenticity on appeal. This evidence was sufficient to support a finding that "the printouts contained content from Facebook." *Id.*

¶ 38    Second, the evidence was also sufficient to support a finding that the Facebook account belonged to Reeves-Burrola and that she sent the messages. *See id.* at ¶ 33. The account was registered in Reeves-Burrola's name and included her profile photo and hometown. Reeves-Burrola's email address was also associated with the account.[3] Moreover, the substance of the messages provided further indication that Reeves-Burrola sent them. *See Heisler*, ¶ 12. The messages, sent hours after the shooting, referred to the shooting, the victim, and the theft of Reeves-Burrola's car and keys. And the person Reeves-Burrola messaged called her "Jessica" in response. *See Glover*, ¶ 32 (noting that others referred to the defendant by his nickname in the Facebook messages).

¶ 39    Under these circumstances, we conclude that the district court did not abuse its discretion under CRE 901(b) by admitting

---

[3] Reeves-Burrola later testified that the messages came from her Facebook account and that she was next to her roommate while they were written, but she denied writing the messages.

the Facebook messages. To the extent Reeves-Burrola denied sending them, that was a question for the jury. *See A.C.E-D.*, ¶ 43.

## IV. Jury Instructions

¶ 40 Reeves-Burrola also contends that the district court plainly erred by (1) failing to give the jury a multiple assailant or apparent necessity instruction and (2) giving a provocation instruction that was unsupported by the evidence. We perceive no plain error.

### A. Additional Background

¶ 41 The district court gave the jury four instructions on self-defense: two on deadly physical force for the shooting of Sandoval (one as an affirmative defense and one as an element-negating traverse) and two on general "defense of person" for the shooting of Moreno (again as an affirmative defense and as an element-negating traverse). All four instructions tracked the Colorado model jury instructions on self-defense, and each incorporated the provocation exception, providing that self-defense does not apply if the actor, "with intent to cause bodily injury or death to another person," provokes "the use of unlawful physical force by that other person."

¶ 42　Reeves-Burrola did not request an instruction regarding multiple assailants or apparent necessity.  Nor did she object to the inclusion of the provocation exception in the instructions.

## B.　Standard of Review

¶ 43　The district court must correctly instruct the jury on all applicable matters of law.  *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011); *People v. Roberts-Bicking*, 2021 COA 12, ¶ 17.  We review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law.  *Riley*, 266 P.3d at 1092-93.  If the district court properly instructed the jury on the applicable law, we review its decision to give or not give a particular instruction for an abuse of discretion and will not disturb that decision unless it is manifestly arbitrary, unreasonable, or unfair.  *Roberts-Bicking*, ¶ 17.

¶ 44　Because Reeves-Burrola did not raise either of her challenges to the instructions in the district court, we may reverse only for plain error.  *Hoggard v. People*, 2020 CO 54, ¶ 13.  Plain error is obvious and substantial error that "so undermine[d] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction."  *Id.* (citation omitted).

## C.  Multiple Assailants and Apparent Necessity

¶ 45  In a self-defense case involving multiple assailants, the jury must consider the "totality of the circumstances, including the number of persons reasonably appearing to be threatening the defendant," in evaluating the reasonableness of the defendant's belief in the need for self-defense and the degree of force used. *Riley*, 266 P.3d at 1094.  But the district court does not need to give a specific multiple assailants instruction in every such case.[4]  *Id.* Rather, all that is required is that "the given instructions properly direct the jury to consider the totality of the circumstances" in assessing the reasonableness of the defendant's actions.  *Id.*

¶ 46  For two reasons, the district court did not plainly err by failing to give a multiple assailants instruction when Reeves-Burrola did not request one.  First, the evidence and defendant's argument did not obviously implicate a multiple assailants theory of defense.

---

[4] Reeves-Burrola relies on *People v. Manzanares*, 942 P.2d 1235, 1240 (Colo. App. 1996), *abrogated by Riley v. People*, 266 P.3d 1089 (Colo. 2011), and other cases that predate *Riley* for the proposition that a multiple assailants instruction must be given in any case involving multiple participants.  But to the extent pre-*Riley* case law suggests that such an instruction is always required, *Riley* held otherwise.  *See People v. Roberts-Bicking*, 2021 COA 12, ¶¶ 20-21.

Although Reeves-Burrola testified that two men rushed toward her when they opened the door, she said she fired her gun because *Sandoval* shot at her. In both opening and closing, Reeves-Burrola's counsel similarly argued that she shot because she believed that *Sandoval* was going to kill her. She did not assert that Moreno did anything other than follow Sandoval. Nor did she assert that anyone else in the apartment had done anything at all.

¶ 47    Second, even assuming the evidence supported a multiple assailants theory, the instructions as a whole properly directed the jury to "consider *all* relevant evidence when assessing the reasonableness of the defendant's actions," which necessarily includes the number of perceived assailants. *Riley*, 266 P.3d at 1094. The affirmative defense instructions each told the jury to "consider[] all the evidence" in determining whether the prosecution had satisfied its burden of disproving the defenses. While the traverse instructions did not themselves include that language, the elemental instructions to which they referred did. Moreover, each of the instructions "accurately defined self-defense in terms of the reasonableness" of Reeves-Burrola's belief in the imminent use of physical force against her and the degree of force necessary. *Id.*

Such language was not obviously insufficient to encompass a multiple assailants theory of defense, to the extent Reeves-Burrola asserted one. *See id.* at 1095 (holding that no multiple assailants instruction was required based on similar model instruction).

¶ 48    We recognize that *Roberts-Bicking* concluded that the model instruction on self-defense "alone fails to adequately instruct the jury to consider the totality of the circumstances in a multiple assailant scenario." *Roberts-Bicking*, ¶ 26.  But in *Roberts-Bicking*, the defendant requested a multiple assailants instruction.  Reeves-Burrola did not.  We cannot say that the district court plainly erred by failing to sua sponte give a separate multiple assailants instruction that was not squarely presented by the evidence or raised by the parties, particularly when the given instructions accurately defined self-defense.  *See Riley*, 266 P.3d at 1094-95.

¶ 49    Finally, the district court did not plainly err by failing to give a jury instruction on apparent necessity.  A self-defense instruction that tracks the statutory language — as the ones here did — "sufficiently encompasses the concept of apparent necessity," thus making a separate instruction unnecessary. *Roberts-Bicking*, ¶ 23; *see also Beckett v. People*, 800 P.2d 74, 77-78 (Colo. 1990).

## D. Provocation Instruction

¶ 50    We also reject Reeves-Burrola's contention that the district court plainly erred by instructing the jury on provocation.

¶ 51    A person may not use physical force in self-defense if, "[w]ith intent to cause bodily injury or death to another person, [the defendant] provokes the use of unlawful physical force by that other person." § 18-1-704(3)(a), C.R.S. 2024. This exception applies when (1) the other person uses unlawful physical force against the defendant; (2) the defendant provoked the use of such physical force; and (3) the defendant intended the provocation to "goad the other person into attacking [them] in order to provide a pretext to injure or kill that person." *Galvan v. People*, 2020 CO 82, ¶ 19.

¶ 52    When the district court instructs the jury on self-defense as an affirmative defense, it should instruct the jury on the provocation exception if there is "some evidence" to support it. *Id.* at ¶ 25. In reviewing the decision to give such an instruction, we must view the evidence in the light most favorable to the instruction. *Id.* at ¶ 33.

¶ 53    Viewed in that light, we conclude that there was some evidence to support the provocation exception. The evidence indicated that Reeves-Burrola went to the apartment armed and

24

with three other people because she believed the people who had stolen her car were in that apartment. She knocked on the door and held the gun in such a way that it was visible to Sandoval immediately upon opening the door. And Reeves-Burrola testified that Sandoval shot at her first. After the shooting, Reeves-Burrola told a third party she shot Sandoval because he stole her car.

¶ 54     From this evidence, a jury could reasonably find that (1) Sandoval used unlawful physical force against Reeves-Burrola; (2) Reeves-Burrola provoked that physical force by showing up to the apartment unannounced and brandishing a gun; and (3) by doing so, she intended to incite a confrontation that would allow her to shoot Sandoval in retaliation for stealing her car. There could certainly be other reasonable interpretations of the evidence, but the resolution of conflicting reasonable inferences is part of the jury's factfinding function. *See Roberts-Bicking*, ¶ 40.

¶ 55     At a minimum, under these facts, the provocation exception was not so obviously inapplicable that the district court should have been alerted to strike it from the instruction without the benefit of an objection. *See People v. Crabtree*, 2024 CO 40M, ¶ 42.

## V.    Disposition

¶ 56    The judgment is affirmed.

JUDGE DUNN and JUDGE BROWN concur.