23CA0529 Peo v Dixon 07-31-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0529
Arapahoe County District Court No. 21CR1798
Honorable Darren L. Vahle, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Daniel Donte Dixon,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE BROWN
Dunn and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 31, 2025

---

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Mulligan Breit, LLC, Patrick J. Mulligan, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Daniel Donte Dixon, appeals the judgment of conviction entered on seven counts of sexual abuse of a child by one in a position of trust as a pattern of abuse. Dixon contends that the district court made multiple evidentiary errors and that the cumulative effect of the alleged errors requires reversal. We affirm.

## I.    Background

¶ 2    Dixon was engaged to B.C.'s mother, and B.C. referred to him as her stepfather. When B.C. was fifteen years old, Dixon began making sexual advances toward her and then took her virginity. B.C. testified that Dixon penetrated her vaginally with his penis on more than one occasion in the room he shared with her mother or on the family's couch. B.C. also testified that Dixon penetrated her anally and made her perform oral sex on him and that he performed oral sex on her.

¶ 3    When B.C. was sixteen years old, Dixon impregnated her twice. B.C.'s first pregnancy ended in a miscarriage and her second pregnancy was terminated through an abortion.

¶ 4    B.C. said she did not disclose the abuse until she was seventeen because she was scared. But she collected proof of the assaults, including numerous text messages and a cell phone video

recording of a conversation she had with Dixon about her pregnancies and abortion, during which Dixon admitted it was "wrong" that he took her virginity and got her pregnant.

¶ 5    The prosecution charged Dixon with seven counts of sexual assault on a child by one in a position of trust as a pattern of abuse.[1]  After a five-day trial, a jury convicted Dixon as charged. The district court sentenced him to a total of seventy-two years to life in the custody of the Department of Corrections.

## II.    Evidentiary Challenges

¶ 6    Dixon contends that the district court erred by admitting (1) an excerpt from an extraction report for B.C.'s cell phone and testimony about the report; (2) testimony from two generalized experts; (3) testimony from a health center assistant at the abortion clinic; and (4) a detective's testimony about a video exhibit.  We address and reject each contention.

---

[1] The prosecution also charged Dixon with one count of aggravated incest but moved pretrial to dismiss the charge, and the court granted the motion.

## A. Standard of Review

¶ 7 We review a trial court's evidentiary rulings for an abuse of discretion. *Zapata v. People*, 2018 CO 82, ¶ 25. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law. *People v. Liggett*, 2021 COA 51, ¶ 16.

¶ 8 We review preserved evidentiary claims for harmless error. *Hagos v. People*, 2012 CO 63, ¶ 12. Reversal under this standard is only required "if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

¶ 9 We review unpreserved evidentiary claims for plain error. *Id.* at ¶ 14. Plain error is error that is obvious and substantial, such that it undermines the fundamental fairness of the trial so as to cast serious doubt on the reliability of the judgment of conviction. *Id.* For an error to be "plain," it "must be so clear-cut, so obvious, that a trial judge should be able to avoid it without benefit of objection." *People v. Pollard*, 2013 COA 31M, ¶ 39. Generally, for an error to be obvious, it must contravene a statute or rule, a

well-settled legal principle, or established Colorado case law. *Campbell v. People*, 2020 CO 49, ¶ 25.

### B.    Cell Phone Extraction Report

¶ 10    Dixon contends that the district court erred by admitting an excerpt from the extraction report for B.C.'s cell phone because (1) the report was not properly authenticated and was unreliable; (2) the prosecution failed to lay sufficient foundation to connect Dixon to the text messages reflected in the report excerpt; and (3) the contents of the report excerpt and testimony about the report excerpt constituted inadmissible hearsay.  We disagree.

### 1.    Additional Background

¶ 11    At trial, B.C. testified that she communicated with Dixon through a messaging application called TextNow on her cell phone. B.C. said that she texted Dixon under his real name and under the name "Jennifer," a name she assigned to him in the TextNow app.

¶ 12    Investigator Jared Lobato was qualified without objection as an expert in digital forensics and downloads and testified about the standard procedure for extracting the contents of a cell phone. Investigator Lobato stated that the police department uses Cellebrite software to extract and format the phone's data into a

readable form. He said he downloaded the contents of B.C.'s phone through the standard process and did not encounter any issues. Investigator Lobato did not personally review the contents of the extraction report, but he gave the report to the lead detective, Detective Saied Radpour, who reviewed the report.

¶ 13 The prosecution marked two exhibits culled from the extraction report: Exhibit 9A, a 600-page collection of text messages between B.C. and Dixon and between B.C. and "Jennifer," and Exhibit 9, a 60-page excerpt from the 600-page exhibit. The prosecutor had B.C. review parts of Exhibit 9A. Although B.C. did not recognize some of the texts because they "[didn't] really sound like [her]," she recognized the texts between her and "Jennifer" as texts from her phone and again identified "Jennifer" as Dixon.

¶ 14 Detective Radpour testified that the TextNow app was on B.C.'s phone and that he viewed the text messages between B.C. and Dixon and those between B.C. and "Jennifer" on B.C.'s phone. He said that the text messages in Exhibit 9A were "a fair and accurate representation of the text messages [he] downloaded from [B.C.]'s phone."

¶ 15    The prosecutor initially moved to admit Exhibit 9A, but defense counsel objected on the basis that the text messages were not connected to Dixon.  The court overruled that foundation objection, citing the evidence it had heard that "Jennifer" was Dixon, but the court had its own concerns with the volume of text messages in Exhibit 9A, noting that they were not all relevant.  The prosecutor explained that she had emailed defense counsel Exhibit 9, the 60-page excerpt of Exhibit 9A, and that "counsel wanted more context to the text messages."  Defense counsel responded that he did not want the entirety of the 600 pages admitted or even the majority of the 60 pages but acknowledged that he "requested . . . the context . . . immediately surrounding . . . what they . . . propose as incriminating evidence."  The court ultimately rejected Exhibit 9A because "the entire 600 pages [was] not relevant," but it allowed the prosecutor to pursue Exhibit 9.

¶ 16    The prosecutor then questioned Detective Radpour about Exhibit 9.  The detective said that Exhibit 9 contained "a fair and accurate" representation of the text messages in Exhibit 9A.  The prosecutor moved to admit Exhibit 9, and defense counsel said, "No objection."  The court admitted the exhibit.

6

¶ 17    But after the prosecutor started reading a text from Exhibit 9 aloud to the detective, defense counsel objected to "hearsay." Counsel argued that he had understood Exhibit 9 to contain only messages between B.C. and Dixon, but the message the prosecutor read aloud was between B.C. and "Jennifer," and those messages should not have been admitted because "there's no connection between Jennifer and [Dixon] at this point."[2]  The court overruled what it understood to be another "foundation" objection because "[B.C.] testified that all texts to Jennifer were to Daniel.  And this is the download of the phone."

### 2.    Authenticity and Reliability

¶ 18    Dixon contends that the district court erred by admitting Exhibit 9, the 60-page excerpt of the extraction report, because the extraction report was not properly authenticated and was unreliable.  We disagree.

---

[2] Defense counsel actually said, "[T]here's no connection between Jennifer and [B.C.] at this point," but given the nature of counsel's argument, it seems likely he misspoke.  Our analysis remains the same regardless.

### a. Applicable Law

¶ 19    Authenticity is a condition precedent to admissibility.  CRE 901(a).  The condition "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.*; *People v. N.T.B.*, 2019 COA 150, ¶ 16.  The burden to authenticate evidence is low — only a prima facie showing is required.  *Gonzales v. People*, 2020 CO 71, ¶ 27.  "Once the proponent meets this burden, the actual authenticity of the evidence and the effect of any defects go to the weight of evidence and not its admissibility." *N.T.B.*, ¶ 16.

> Because the rule's plain language instructs that a proponent need only provide sufficient evidence to support a finding that the proffered evidence is what the proponent claims, the rule vests trial courts with broad discretion to consider a variety of foundational circumstances depending on the nature of the proffered evidence.

*Gonzales*, ¶ 30; *see also Colo. Citizens for Ethics in Gov't v. Comm. for Am. Dream*, 187 P.3d 1207, 1213 (Colo. App. 2008) ("Whether a proper foundation has been established is a matter within the sound discretion of the trial court, whose decision will not be disturbed absent a clear abuse of discretion.").

¶ 20    "The reliability of machine-generated records can be established 'through the testimony of the operator of the machine or any other relevant evidence.'" *People v. Hamilton*, 2019 COA 101, ¶ 33 (quoting *Thomas v. People*, 895 P.2d 1040, 1045 (Colo. 1995)). And a proponent of electronically generated printouts may authenticate them "through the testimony of a person with personal knowledge of how the printouts were generated and that they are what they are claimed to be." *Id.* at ¶ 36.

b.    The Prosecution Laid Sufficient Foundation to Show that the Extraction Report Was Authentic and Reliable

¶ 21    Dixon contends that Exhibit 9 was not properly authenticated and was not reliable because Investigator Lobato did not testify that the extraction report accurately reflected the contents of B.C.'s phone. To be sure, defense counsel did not object to the admission of Exhibit 9 on this specific basis. But even assuming he did, we are not persuaded that the district court abused its discretion.

¶ 22    Dixon seems to argue that only the person who performed the extraction of B.C.'s phone could authenticate the extraction report or establish its reliability. But Dixon fails to identify, and we are not aware of, any case law requiring that the authenticity of an

9

exhibit be established through a single witness. So long as the prosecution made a prima facie showing that Exhibit 9 was what the prosecution purported it to be — text messages accurately downloaded from B.C.'s phone — it met the low threshold for authentication. *See* CRE 901(a); *Gonzales*, ¶ 27.

¶ 23 Through the collective testimony of B.C., Investigator Lobato, and Detective Radpour, the prosecution presented evidence that (1) text messages between B.C. and Dixon/"Jennifer" were on B.C.'s phone; (2) the contents of B.C.'s phone were extracted without incident and formatted into a report by Cellebrite software; (3) the extraction report accurately reflected the text messages that were on B.C.'s phone; and (4) Exhibit 9 accurately reflected the text messages in the extraction report. Although Investigator Lobato did not testify that the extraction report accurately reflected the text messages on B.C.'s phone, Detective Radpour did (and so did B.C., to a limited extent). This evidence was enough to establish that the exhibit was authentic and reliable. *See Gonzales*, ¶ 27; *Hamilton*, ¶ 33.

¶ 24 We are not persuaded otherwise by Dixon's reliance on *Hamilton*, in which a division of this court concluded that a

detective's testimony about machine-generated reports reflecting the downloaded contents of two cell phones was inadmissible hearsay. *Hamilton*, ¶ 41. In that case, a detective testified only that police downloaded the contents of the defendant's and the victim's phones and generated reports reflecting the phones' contents, that he viewed the reports, and that neither phone contained text messages from the victim to the defendant as the defendant claimed. *Id.* at ¶ 9.

¶ 25    The reports themselves were not offered or admitted into evidence. *Id.* Nonetheless, as part of its analysis, the division considered whether the prosecution had established the reliability and authenticity of the reports. *Id.* at ¶¶ 11, 31-40. The division concluded that the prosecution had failed to show that the reports were authentic and reliable because it offered no evidence that (1) the machine used to generate the reports produced accurate reports of the phones' contents; (2) the machine was in proper working condition; (3) the machine operator was qualified; (4) the operator followed proper procedures; (5) the reports were valid or reliable; or (6) the detective who testified about the reports was qualified to interpret them. *Id.* at ¶¶ 37-38.

11

¶ 26     We are not bound by *Hamilton, see People v. Smoots*, 2013

COA 152, ¶ 21 ("[W]e are not bound by the decisions of other

divisions of this court."), *aff'd sub nom. Reyna-Abarca v. People,*

2017 CO 15, nor are we particularly persuaded by its "inflexible set

of requirements that must be met to authenticate cell phone

extraction reports, which appears inconsistent with *Gonzales,"*

*People v. Abad,* 2021 COA 6, ¶ 47 n.4.  Even so, *Hamilton* is

factually distinguishable.

¶ 27     Here, Investigator Lobato, the person who conducted the

extraction of B.C.'s cell phone, was qualified without objection as an

expert in digital forensics and downloads, explained the standard

procedure for using Cellebrite software to extract data from a cell

phone, and testified that the extraction reports created by that

procedure are spot checked by others.  Investigator Lobato said that

he followed the standard procedures he described and that there

were no issues with the extraction of B.C.'s cell phone.

¶ 28     For his part, Detective Radpour testified that the extraction

report and the excerpt of that report that was admitted as Exhibit 9

accurately reflected the text messages from B.C.'s cell phone.  He

was able to give that testimony because he personally viewed the contents of the phone and the extraction report.

¶ 29     And Detective Radpour's testimony was not, as Dixon argues, improper expert testimony in the guise of lay testimony. Detective Radpour's opinion that Exhibit 9 accurately reflected the contents of B.C.'s phone was rationally based on his observations of the phone and report, was helpful to understand the import of Exhibit 9, and was not based on scientific, technical, or specialized knowledge. *See* CRE 701; *Venalonzo v. People*, 2017 CO 9, ¶ 53 ("If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony."). Any ordinary person could compare text messages on a phone to a printout of those text messages and determine whether they match.

¶ 30     Thus, the district court did not abuse its discretion by concluding that the prosecution laid sufficient foundation to establish that Exhibit 9 was authentic and reliable. *See Gonzales*, ¶ 30; *N.T.B.*, ¶ 16.

### 3. Messages from "Jennifer" and Detective Radpour's Testimony that "Jennifer" Was Dixon

¶ 31    To the extent Dixon implicitly contends that the prosecution failed to lay sufficient foundation to connect Dixon to the text messages from "Jennifer," we reject that contention.  We also reject Dixon's related argument that Detective Radpour offered unqualified expert testimony that he "personally determined" Dixon was "Jennifer."

### a. Sufficient Evidence Connected Dixon to "Jennifer"

¶ 32    The identity of a purported sender of text messages

> may be established through a combination of at least two of the following: (1) the phone number was assigned to or associated with the purported sender; (2) the substance of the text message(s) was recognizable as being from the purported sender; (3) the purported sender "responded to an exchange in such a way as to indicate circumstantially that [they were] in fact the author of the communication"; or (4) any other corroborative evidence under the circumstances.

*People v. Heisler*, 2017 COA 58, ¶ 15 (quoting *People v. Glover*, 2015 COA 16, ¶¶ 30-34).

¶ 33    B.C.'s testimony provided evidence that the phone number for "Jennifer" was associated with Dixon.  *See id.*  B.C. testified that,

"[w]hen everything was first happening, [Dixon] would tell [her]" not to use his "actual name" when texting him, so she assigned the name "Jennifer" to a number Dixon used to text her through the TextNow app. Because she named Dixon "Jennifer," she knew that the messages from "Jennifer" were actually from Dixon. She also said that she recognized the messages between her and "Jennifer" in Exhibit 9A as messages between her and Dixon reflecting their "sexual relationship."

¶ 34 In addition, Exhibit 9 reflects several text messages in which "Jennifer" either conveyed content recognizable as being from Dixon or responded in such a way as to indicate circumstantially that Dixon was in fact the author of the communication, *see id.*, including the following:

- an exchange in which B.C. addressed "Jennifer" as "Daniel," and "Jennifer" responded, "Damn did you have to put my name";

- other messages between B.C. and "Jennifer" in which B.C. addressed "Jennifer" as "Daniel," and "Jennifer" did not express confusion at being called "Daniel" or deny being "Daniel";

- an exchange between B.C. and "Jennifer" in which B.C. asked "Jennifer," "Do you feel nasty when we had sex in you and my mom bed," and "Jennifer" responded, "I wasn't and haven't done anything wit ya mama in while";

- a message in which "Jennifer" complained about B.C.'s mom and the financial issues they were having; and

- an exchange in which B.C. said to "Jennifer," "I feel nasty cause you are my step dad [a]nd you use to do all the same stuff to my mom," and "Jennifer" responded, "So you never said if you wanted to stop."

¶ 35    Exhibit 9 contains many more similar examples of exchanges between B.C. and "Jennifer."  B.C.'s testimony and the content of Exhibit 9 provided more than enough evidence to establish that Dixon was the sender of the text messages from the phone number B.C. saved as "Jennifer."  *See id.*

### b.    Detective Radpour Did Not Offer Expert Testimony that "Jennifer" Was Dixon

¶ 36    Dixon argues that Detective Radpour impermissibly testified that he "personally determined" that "Jennifer" was Dixon.  But Dixon fails to point to any part of the record where Detective

Radpour said as much. Instead, Detective Radpour testified about the steps he went through to "find out" that "Jennifer" was Dixon, including his experience setting up a new profile in the TextNow app that B.C. and Dixon used to message each other. He said that a new user on TextNow is first prompted to choose from a list of phone numbers, and once the user chooses a number, the number is assigned to the user and appears as that person's phone number. But the detective admitted he was unable to connect Dixon to the phone number associated with "Jennifer" on the TextNow app.

¶ 37     In any event, Detective Radpour's testimony was not expert testimony because (1) he was discussing the steps of his investigation, *see People v. Penn*, 2016 CO 32, ¶¶ 32-33 (the trial court did not plainly err by admitting police testimony explaining investigative steps in a factual manner that provided context); and (2) any lay person could go through the steps to set up a profile in the TextNow app, *see Venalonzo*, ¶ 53.

### 4.     Hearsay

¶ 38     Dixon next contends that (1) the extraction report was hearsay because the prosecution failed to establish that it was generated without human input or interpretation; (2) the contents of B.C.'s

17

phone reflected in Exhibit 9 were hearsay; and (3) the detective's testimony about Exhibit 9 was "hearsay within hearsay." We disagree.

### a. Applicable Law

¶ 39 Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). A declarant is "a person who makes a statement." CRE 801(b). A "statement" is either "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person to be communicative." CRE 801(a). Hearsay is inadmissible except as provided by the rules of evidence or other applicable statutes or rules. CRE 802; *People v. Buckner*, 228 P.3d 245, 249 (Colo. App. 2009).

¶ 40 When a statement contains multiple layers of hearsay, we must analyze each layer separately to determine if any include inadmissible hearsay. *See Abad*, ¶¶ 58-59. "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule." *Id.* at ¶ 59.

18

## b. The Extraction Report Was Not Hearsay

¶ 41    Information automatically generated by machines is not hearsay because no "person" or "declarant" made a "statement" within the meaning of CRE 801. *Buckner*, 228 P.3d at 250; *see also Abad*, ¶ 54. However, if the creation of a computer-generated record involves human input or interpretation, it may constitute hearsay. *Hamilton*, ¶ 30.

¶ 42    Relying on *Hamilton*, Dixon contends that Exhibit 9 constitutes hearsay because the prosecution failed to establish that it was generated without human input or interpretation. But in *Hamilton*, there was no testimony about how the extraction report was generated. *Id.* at ¶¶ 21-26. In contrast, Investigator Lobato testified that, to generate an extraction report, he disconnects the phone from Wi-Fi and its network, enables settings that allow it to transfer files, and plugs it into a forensic extraction device. From there, *Cellebrite software* extracts the phone's data and converts it into a readable format. Investigator Lobato followed these steps to extract the contents of B.C.'s phone and then gave the extraction report to Detective Radpour.

¶ 43     Investigator Lobato's testimony established that the extraction report was generated by computer software without human input or interpretation.  Dixon does not point to any contrary record evidence.  Because the extraction report was generated by a machine, the report itself is not a "statement" made by a "declarant," and therefore it is not hearsay.  *See Buckner*, 228 P.3d at 250; *Abad*, ¶ 56.

    c.    The Text Messages Reflected in Exhibit 9 Were Not Hearsay

¶ 44     To the extent the text messages reflected in Exhibit 9 were from Dixon, they were not hearsay because they were his own statements offered against him.  *See* CRE 801(d)(2).  And to the extent Dixon argues that the text messages were hearsay because the prosecution failed to connect him to "Jennifer," we have already rejected that argument.  Thus, any messages from "Jennifer" were also admissions by a party opponent and not hearsay.  *See id.*

¶ 45     To the extent Dixon argues that the text messages from B.C. were inadmissible hearsay, he did not preserve this claim, so we review it for plain error.  *See Hagos*, ¶ 14.  Defense counsel's belated "hearsay" objection to Exhibit 9 was premised exclusively

on the lack of "connection between Jennifer and [Dixon]."[3]  Counsel did not call the court's attention to the possibility that *B.C.'s messages* might be hearsay.  *See People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004) ("We do not require that parties use 'talismanic language' to preserve particular arguments for appeal, but the trial court must be presented with an adequate opportunity to make findings of fact and conclusions of law on any issue before we will review it.").

¶ 46     Even assuming the district court erred by not sua sponte rejecting B.C.'s text messages as hearsay, we cannot conclude that the error was obvious.  *See Pollard*, ¶ 39.  Notably, Dixon does not identify *which messages* from B.C. included inadmissible hearsay. As a result, we cannot determine (1) whether the messages contain assertions of fact as opposed to questions or imperative declarations, *see People v. Phillips*, 2012 COA 176, ¶ 104 ("[I]mperative declarations, such as orders or instructions, which by their nature can be neither true nor false, . . . fall outside the purview of the hearsay rule." (quoting *Cardin v. State*, 540 N.E.2d

---

[3] Or, as previously noted, "between Jennifer and [B.C.]."  Again, the distinction does not matter to our analysis.

51, 54 (Ind. Ct. App. 1989))); (2) whether any hearsay statements contained in the messages were nonetheless admissible because they satisfied an exception, *see* CRE 803; or (3) whether the messages were offered to provide context for Dixon's statements and not for their truth, *see* CRE 801(c).  Dixon's failure to identify the offending statements so that we can meaningfully analyze whether they constitute hearsay prevents us from concluding that the court plainly erred by admitting B.C.'s text messages.[4]

### d.    Detective Radpour's Testimony Reciting the Messages Reflected in Exhibit 9 Was Not Hearsay

¶ 47    Because Exhibit 9 itself was not hearsay and the text messages reflected in Exhibit 9 were not hearsay, it follows that Detective Radpour's live testimony about the messages reflected in Exhibit 9 was not hearsay.  *See Abad*, ¶ 58; CRE 801(c).  Exhibit 9

---

[4] In his opening brief, Dixon also lists sixteen "statements by Radpour" that he contends revealed the content of the extraction report and were inadmissible hearsay.  But Dixon did not bring any of these "statements" to the attention of the district court, nor does he explain on appeal how any one of the items listed meets the definition of hearsay.  We do not address this underdeveloped argument.  *See People v. Rodriguez-Morelos*, 2022 COA 107M, ¶ 49, *aff'd*, 2025 CO 2.

was admitted into evidence unconditionally, so Detective Radpour was free to read from it and discuss its contents.

¶ 48 Thus, we conclude that the district court did not err by admitting Exhibit 9 or allowing Detective Radpour to testify about or read aloud the messages between B.C. and Dixon/"Jennifer" that were reflected in Exhibit 9. *See Zapata*, ¶ 25; *Liggett*, ¶ 16.

### C. Generalized Expert Testimony

¶ 49 Dixon contends that the district court erroneously admitted the generalized expert testimony of Dr. Beth Peters and Dr. Andrew Sirotnak. We perceive no reversible error.

### 1. Applicable Law

¶ 50 Except where "otherwise provided by constitution, statute, or rule, all relevant evidence is admissible." *People v. Rath*, 44 P.3d 1033, 1038 (Colo. 2002) (citing CRE 402). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401.

¶ 51 Under CRE 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." In

reviewing a trial court's ruling under CRE 403, "we assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *People v. Clark*, 2015 COA 44, ¶ 18 (quoting *People v. James*, 117 P.3d 91, 94 (Colo. App. 2004)).

¶ 52    CRE 702 allows for the admission of qualified expert testimony if it will assist the trier of fact to understand the evidence or to determine a fact in issue. The focus of a Rule 702 inquiry is whether the proffered evidence is both reliable and relevant. *People v. Shreck*, 22 P.3d 68, 77 (Colo. 2001). When admitting expert testimony, a trial court must "make specific findings on the record about the reliability, relevance, and usefulness" of the testimony. *People v. Yachik*, 2020 COA 100, ¶ 54; *see also Ruibal v. People*, 2018 CO 93, ¶ 13 ("With regard to the requirement for specific findings concerning a determination of the reliability and relevance of evidence to be admitted pursuant to CRE 702, with record support, we have . . . been unwavering.").

¶ 53    Generalized expert testimony should "fit the case," but "the fit need not be perfect." *People v. Cooper*, 2021 CO 69, ¶ 5. The "fit inquiry" is a flexible one; "[i]f the generalized expert testimony's

24

logical connection to the factual issues is sufficient to be helpful to the jury without running afoul of CRE 403, the testimony fits the case." *Id.*

### 2. Dr. Peters' Testimony

¶ 54 Dixon contends that the district court erred by admitting Dr. Peters' expert testimony because the court made insufficient findings that the testimony was reliable, relevant, or useful, and because the testimony did not "fit" the facts of the case. We perceive no error.

### a. Additional Background

¶ 55 At trial, defense counsel questioned B.C. extensively regarding the timeline of the abuse, the timing of her disclosure to her mother, and when she collected evidence of the assaults. B.C. could not remember timing in terms of exact years or days, but she remembered her school year and her age.

¶ 56 The prosecution qualified Dr. Peters as an expert in child sexual abuse disclosure patterns, behaviors, and memory processing. Dr. Peters testified that she was familiar with child sex assault victim disclosure patterns and how sexual assault victims processed memories of abuse. She gained that familiarity through

training in graduate school, through continuing education, by reading literature, and by personally working with sexual abuse victims. She also said that she had fifteen years of experience observing these patterns in her more than 500 clients and hearing about them as a supervisor to other clinicians.

¶ 57 Although defense counsel objected to Dr. Peters' qualifications, he did not ask the court to make specific findings regarding the admissibility of Dr. Peters' testimony or object to the court's ruling based on insufficient findings. Defense counsel also did not object to any of Dr. Peters' testimony.

¶ 58 Among other things, Dr. Peters testified that victim disclosure could be affected by grooming, age, and fear of punishment, abandonment, or blame. She said that, because of "their independence and their participation in other rule-breaking behaviors," teenagers may not disclose for fear of being "blamed or [getting] in trouble" for other behaviors they engaged in. She also testified that victims may withhold disclosure if they are in an "unsafe environment" or "they have no space from the perpetrator to give that secret." She explained that children who experience "longer periods of abuse and more intense abuse are more likely to

delay that disclosure." And she said that children generally have difficulty providing a timeline because memories "blend" together.

¶ 59 Dr. Peters also discussed grooming, defining it as "a pattern of behaviors that sexual offenders will exhibit to gain access to sexual contact or activity with victims." She said perpetrators "will pretend it is normal for them to have sex with their teenage children as an educational or instructional normative behavior."

b. The District Court Did Not Err by Admitting Dr. Peters' Testimony

¶ 60 We acknowledge that the court was required to, but did not, make specific findings on the reliability, relevance, or usefulness of Dr. Peters' testimony before admitting it. *See Yachik*, ¶ 54. But "when, as here, no party objects to the admissibility of the proffered expert's testimony, the lack of findings on the record will not necessarily render the expert testimony inadmissible." *People v. Martinez*, 2024 CO 69, ¶ 36.

¶ 61 Dixon's entire argument for why the district court erred by admitting Dr. Peters' testimony is as follows: "None of this '[generalized] expert' testimony was relevant. None of the testimony was helpful to the jury. And none of the testimony was reliable.

The purported expert testimony did not specifically 'fit' the case." Dixon does not explain how the lack of findings prejudiced him, nor does he explain how Dr. Peters' testimony did not "fit" the case — despite Dr. Peters' extensive training and experience and the obvious relevance of her testimony regarding delayed disclosure and grooming. We reject Dixon's underdeveloped argument. *See People v. Rodriguez-Morelos*, 2022 COA 107M, ¶ 49, *aff'd*, 2025 CO 2.

### 3. Dr. Sirotnak's Testimony

¶ 62 Dixon contends that the district court erred by admitting Dr. Sirotnak's testimony because it was not relevant and improperly bolstered B.C.'s credibility. We perceive no error.

### a. Additional Background

¶ 63 B.C. testified that Dixon penetrated her anally when she was sixteen. During cross-examination, defense counsel first confirmed that B.C. had described the anal penetration as "painful," to which B.C. answered, "Yes, very painful." Counsel then asked B.C. if she was "yelling at that time to [Dixon] for him to stop?" B.C. said she was not "yelling at the top of [her] lungs, but [she] was . . . yelling a little bit." B.C. declined counsel's request to demonstrate how loud she was yelling because she was uncomfortable doing so.

¶ 64 Without objection, the prosecution qualified Dr. Sirotnak "as an expert in the field of child abuse, specifically, medical child abuse to include child sexual abuse." Dr. Sirotnak testified that "in the absence of acute sexual assault or concern about trauma . . . there is no one single test" to determine if a child was sexually assaulted. He said that if "a child or an adolescent" disclosed something that "happened within a two to three day, four-day period and or they are disclosing symptoms" such as "pain, bleeding, abnormal rash or discharge in the private part of a body," then "an acute care screening or assessment" in the emergency department would be conducted. But he said that an adolescent may heal "minor trauma" like abrasions very quickly and that other trauma like "cuts with bleeding and lacerations to parts of the body" may "take days to weeks to heal." He testified that in an examination of a child, "greater than 80 percent of the time . . . , we are not going to see physical damage or trauma to a body part." Defense counsel did not object to this testimony.

¶ 65 During closing argument, defense counsel argued that Dr. Sirotnak

> acknowledge[d] that with painful — with, you know, anal sex, he didn't — the things he talked about the vagina not showing injuries and healing quickly, didn't really apply to anal sex where the — when it's painful and there is an injury. And she talked about screaming, you got to — I would think that would involve an injury, if it's true, but there is no effort to find any scarring here.
>
> Some scarring might have, you know, certainly would corroborate some prolonged, painful anal sex, but we didn't, no effort to do that was — was made.

### b. Dr. Sirotnak's Testimony Was Relevant

¶ 66 Dixon contends that Dr. Sirotnak's testimony was irrelevant because there was "no controversy . . . regarding a physical examination" of B.C. and because Dr. Sirotnak "essentially said that injuries might or might not result from sexual abuse." We disagree.

¶ 67 Defense counsel questioned B.C. about her claim that the anal penetration was painful and that she was yelling during the assault. Then counsel argued in closing that the jury should not believe B.C.'s testimony about the anal penetration because there was no effort to find scarring, which counsel argued would have been present under the circumstances B.C. described. Thus, there

30

*was* controversy over B.C.'s physical examination and whether there were, or should have been, signs of physical trauma.

¶ 68    To that end, Dr. Sirotnak's testimony was relevant and helpful because he explained when a physical examination would need to be done on an adolescent to identify acute physical trauma from sexual abuse. He also explained that even cuts or lacerations can heal such that no physical signs of injury are found in most cases. His testimony gave a possible reason why medical professionals did not search for or find scarring despite B.C.'s testimony that the anal penetration was "very painful." Accordingly, the court did not abuse its discretion by concluding that Dr. Sirotnak's testimony was relevant and helpful to the jury. *See Cooper*, ¶ 5; *Liggett*, ¶ 16.

c.    Dr. Sirotnak Did Not Improperly Opine on Witness Credibility

¶ 69    Dixon also contends that Dr. Sirotnak's testimony about the percentage of child sex assault victims who have no visible injuries indirectly and improperly "vouched" for B.C.'s credibility. We are not persuaded.

¶ 70    In Colorado, one witness may not opine on the veracity of another witness. *People v. Murphy*, 2021 CO 22, ¶ 36; *Davis v. People*, 2013 CO 57, ¶ 15. But Dr. Sirotnak never opined that B.C.

31

told the truth or that sexual abuse victims generally tell the truth. *Cf. People v. Marx*, 2019 COA 138, ¶ 17 (an expert's "opinion that only two to six percent 'of sexual assaults that are reported to the police [by children and teenagers] turn out to be false' did not relate to any issue other than the accuser's truthfulness"); *People in Interest of S.M-L.*, 2016 COA 173, ¶ 31 (expert testimony on "statistics regarding the probability of false allegations . . . has long been regarded as improper"), *aff'd*, 2018 CO 31.  And although Dr. Sirotnak's testimony may have incidentally bolstered B.C.'s credibility by explaining why she may not have a physical sign of injury from the abuse, that did not make his testimony inadmissible.  *See People v. Relaford*, 2016 COA 99, ¶ 30 ("[E]xpert testimony generally tends to bolster or attack the credibility of another witness," but that "alone is insufficient to deny admission of the evidence." (quoting *People v. Koon*, 724 P.2d 1367, 1370 (Colo. App. 1986))).  Accordingly, we conclude that the court did not abuse its discretion by admitting the testimony despite its incidental bolstering effect.  *See Cooper*, ¶ 5; *Liggett*, ¶ 16.

32

### D. Lay Testimony

¶ 71 Dixon contends that the district court erred by allowing two witnesses to give expert opinions in the guise of lay testimony. We perceive no reversible error.

#### 1. Schichtel's Testimony

¶ 72 Dixon contends that the district court erred by allowing a Planned Parenthood health center assistant to testify about her observations of B.C. at the clinic because her testimony was irrelevant under CRE 401, unfairly prejudicial under CRE 403, and expert testimony in the guise of lay testimony. We are not persuaded.

##### a. Additional Background

¶ 73 At trial, the prosecution called Lynn Schichtel, who worked as a health center assistant at Planned Parenthood the day B.C. went there to have an abortion. She testified that Planned Parenthood trained her to spot abusive situations by looking for "signs of abuse" or "red flags." Schichtel testified she had a "gut feeling" that something was "off" with B.C., so she reported suspected child trafficking to the Department of Human Services. Although at one point defense counsel objected on the grounds that "we have[n't]

actually identified the red flag" because Schichtel had "only testified to a gut feeling," counsel did not object on any of the grounds raised on appeal.

¶ 74    During cross-examination, defense counsel asked,

> So you're not sure exactly what the problem
> area was that you were identifying by noticing
> a red flag, which really isn't exactly a specific
> red flag that you had been trained to notice,
> though.
>
> Is that fair to say?
>
> It's more like we're acting not on some
> objective evidentiary observations, but instead
> a gut feeling that there's a problem.
>
> Is that fair?

Schichtel answered that she "acted more because the patient was not honest," referring to the fact that B.C. had not disclosed that an adult man was waiting for her in the car.

¶ 75    The prosecution also called Dr. Sabrina Holmquist, the physician who treated B.C. at Planned Parenthood. Dr. Holmquist testified that she was also trained to look for signs of abuse and noticed no red flags when interacting with B.C. that day. The doctor said that patients who are sixteen years old can go into Planned Parenthood on their own for abortion services so long as a

parent has been notified and that it would not be unusual for a parent to sit in their vehicle in the parking lot.

b. The District Court Did Not Plainly Err by Admitting Schichtel's Testimony

¶ 76 Dixon first contends that Schichtel's testimony was irrelevant under CRE 401 and unfairly prejudicial under CRE 403. Even affording the evidence its maximum probative value, *see People v. Welsh*, 80 P.3d 296, 304 (Colo. 2003), we agree with Dixon that it was only marginally relevant. It corroborated B.C.'s testimony about her abortion at the clinic but did little else.

¶ 77 Even so, affording the evidence its minimum unfair prejudice, *see id.*, it was also marginally prejudicial. As Dixon argues on appeal, Schichtel did not testify that she "observe[d] anything wrong or illegal," and her testimony was contradicted by the treating physician. On this record, the district court did not abuse its discretion in balancing the probative value and prejudicial effect of Schichtel's testimony. *See id.*

¶ 78 Dixon also contends that Schichtel's testimony was inadmissible expert testimony in the guise of lay testimony because it was based on her training on how to spot "red flag[s]" for abuse.

True, Schichtel testified that she had been trained by Planned Parenthood to spot signs of abuse. But, as defense counsel pointed out at trial, Schichtel testified only that she had a "gut feeling" about B.C.; she never identified what signs of abuse she was trained to spot or if she saw those signs with respect to B.C. specifically. So it does not appear that Schichtel's testimony was based on any specialized experience or training. *See Venalonzo*, ¶ 53. At a minimum, it would not have been obvious to the district court that Schichtel was offering an expert opinion. *See Pollard*, ¶ 39. Thus, we conclude that any error in admitting Schichtel's testimony was not plain. *See Hagos*, ¶ 14.

### 2. Detective Radpour's Video Exhibit Testimony

¶ 79 Dixon contends that the district court erred by allowing Detective Radpour to give unqualified expert testimony that (1) the prosecution edited a video marked as Exhibit 4 in "compl[iance with] the Rules of Evidence," and (2) the original video ran smoothly without the edits made by the prosecution. We are not persuaded.

### a. Additional Background

¶ 80 The prosecutor sought to admit an edited version of the cell phone video B.C. recorded of her conversation with Dixon about the

36

abuse as Exhibit 4. Detective Radpour testified that he viewed both the original video on B.C.'s phone and Exhibit 4 and that there were some "hard cuts" in the exhibit that were not in the original video.

¶ 81 The prosecutor asked, "Within the People's Exhibit 4, I mentioned there were hard cuts. Is that something I did to comply with a Rule of Evidence or something else?" Detective Radpour answered, "On what I saw, you did comply with the Rules of Evidence." The prosecutor then asked Detective Radpour to confirm, "without [going over] some Rules of Evidence," that the prosecutor had cut out portions of the video in which Dixon had named other women who had abortions. The detective confirmed the prosecutor's representation.

¶ 82 The prosecutor then asked Detective Radpour to confirm that another portion of the video had been cut because there was "[a] lot of commotion in the — in the pocket, but you cannot really hear anybody saying anything." The detective so confirmed. Finally, the detective testified that, without the edits, "the video overall [ran] smoothly from start to finish."

¶ 83 Defense counsel did not object to any of this testimony.

### b. The District Court Did Not Plainly Err by Admitting Detective Radpour's Testimony

¶ 84 Addressing the testimony in reverse order, we first conclude that Detective Radpour's explanation of the differences between the original and the edited versions of the video was not expert testimony. It was based on a comparison of the two videos that any lay person could perform. *See Venalonzo*, ¶ 53.

¶ 85 Second, although it may have been improper for the detective to give an opinion about "the Rules of Evidence," Dixon does not explain how that testimony undermined the fundamental fairness of the trial. *See Hagos*, ¶ 14. The challenged testimony was brief, and neither the prosecutor nor the detective elaborated on what complying with the rules of evidence meant. *See People v. Salas*, 2017 COA 63, ¶ 12 (inadmissible evidence has less prejudicial impact when the reference is fleeting).

¶ 86 We perceive no reversible error. *See Hagos*, ¶ 14.

### E. Cumulative Error

¶ 87 Finally, Dixon contends that, even if the individual alleged errors do not require reversal, their cumulative prejudicial impact does. We have assumed for purposes of our analysis that the

district court may have committed three unpreserved errors that were not plain: the text messages from B.C. contained in Exhibit 9 may have been hearsay but were not obviously so, Schichtel's testimony about "red flags" may have been expert opinion but was not obviously so, and Detective Radpour's testimony about the video being edited in accordance with the rules of evidence was unqualified expert testimony but was not substantial. Even viewed collectively, these errors did not deprive Dixon of a fair trial given the nature and extent of the other evidence presented. *See People v. Vialpando*, 2022 CO 28, ¶ 33 (cumulative error doctrine requires the reviewing court to determine if the errors, when viewed in the aggregate, deprived a defendant of a fair trial).

III.    Disposition

¶ 88    We affirm the judgment.

JUDGE DUNN and JUDGE SCHOCK concur.